## TEXAS CO. v. PENSACOLA MARITIME CORPORATION.

(Circuit Court of Appeals, Fifth Circuit. March 10, 1922.)

No. 3798.

1. **Contracts ☞10(4)—Contract to sell requirements for resale of corporation, which had not yet established business, does not lack mutuality.**

A contract for the sale of plaintiff's requirements of oil for resale to ships does not lack mutuality, even though the plaintiff had as yet no established business for the sale of fuel oil for ships, and especially where plaintiff did have an established business in the sale of coal as a fuel for ships, since plaintiff's agreement to buy its oil only from defendant was a detriment to it sufficient to support the contract.

2. **Sales ☞418(12)—Buyer can recover nominal damages for breach, though actual damages cannot be proved.**

A buyer can recover at least nominal damages for breach of a contract for sale of fuel oil intended for resale, though he cannot establish prospective profits on the resale with sufficient certainty to sustain a recovery of substantial damages.

3. **Pleading ☞428(3)—Right to object to additional oral contract is waived by failure to object to pleading alleging it.**

Where the amended declaration for breach of a written contract of sale alleged as a further consideration for the contract that plaintiff undertook to use its employees in the United States and to send an agent to Europe to promote the sale of defendant's product, on which allegations defendant joined issue without raising any objection, it was not error to receive evidence in support of the allegations as to the oral undertaking.

4. **Sales ☞416(2)—Evidence of buyer's efforts to establish market held admissible as to value of obligation.**

In an action for breach of a contract to sell to plaintiff its requirements of bunker oil for resale to ships, evidence as to the efforts made by plaintiff to resell defendant's oil is admissible to show what it was intended plaintiff should do under its undertaking to take all the bunker oil required by it and as bearing on the value of that obligation to plaintiff.

5. **Sales ☞87(3)—Evidence held not to show undertaking to spend money in reselling goods.**

In an action for breach of a contract to sell to plaintiff its requirements of fuel oil for resale to ships, evidence held not to show an agreement by plaintiff to make the expenditures it did make in attempting to resell defendant's oil.

6. **Forfeitures ☞1, 2—Not favored, and provisions are strictly construed.**

Forfeitures are not favored, and provisions therefor will be strictly construed.

7. **Sales ☞84—Provision for forfeitures for failure to pay when due may give only option to terminate contract.**

In a contract requiring payment for oil sold upon completion of delivery, a provision that a failure to pay any amount when due may, at the seller's option, terminate the contract, does not necessarily mean that the contract is terminated for failure to pay immediately on completion of delivery, but may mean that such failure gives to the seller the option to declare the contract for future deliveries canceled.

8. **Sales ☞84—Equity will generally relieve against forfeiture for nonpayment on the making of payment.**

The purpose of a reserved right to terminate a contract for nonpayment is in the nature of security for the payment, and where the only fault is nonpayment it is the usual course of equity to relieve against an exercise of such forfeiture on tender of payment with interest.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. Sales ⊚⟶101—**Option to forfeit for nonpayment is waived by acceptance of overdue payment before exercising the option.**

The right to terminate a contract of sale of oil for failure to make payments immediately on delivery of the oil as required by contract is waived, where the seller thereafter without objection accepted the payments, so that there were none due at the time it attempted to declare the contract forfeited.

10. Sales ⊚⟶418(12)—**Buyer of requirements entitled to damages for only such oil as it had contracts to resell.**

Where a contract provided for the sale to plaintiff of plaintiff's requirements of bunker oil for resale to ships, not to exceed specified maximum quantities, plaintiff cannot recover for the seller's breach of the contract damages computed on the maximum amount of oil it could require under the contract, but only for the oil which it shows it had contracted to resell to ships at the specified port.

11. Sales ⊚⟶417—**Evidence held to entitle buyer to damages only for oil resold to two vessels.**

In an action for breach of a contract to sell to plaintiff its requirements of bunker oil for vessels at a specified port, evidence *held* to entitle plaintiff to damages only for failure to deliver the oil required for two vessels to which plaintiff had contracted to sell oil for fuel, notwithstanding evidence as to negotiations for a contract for the sale of the maximum quantity of oil which plaintiff could require under the contract, which were not consummated, and which were not shown to provide for delivery to vessels at the specified port.

12. Sales ⊚⟶418(12)—**Buyer held entitled to loss of profits, not difference between contract and market price.**

. A buyer of bunker oil for resale to ships was entitled under the evidence only to damages for oil he contracted to sell to two vessels, and to recover only the profit he would have made on the contracts with those two vessels, not the difference between the sale price of the oil to him and the market value.

13. Sales ⊚⟶418(3)—**Difference between market and contract price not allowed, where actual damage is less.**

The purpose of the law is to award plaintiff the actual damages he has sustained, so that the rule that the measure of damages for breach of a contract for the sale of goods is the difference between the market price and the contract price does not apply, where the evidence shows that the actual damages suffered has been less than such difference.

Walker, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the Northern District of Florida; William B. Sheppard, Judge.

Action by the Pensacola Maritime Corporation against the Texas Company to recover damages for breach of contract for the sale of oil. Judgment for plaintiff, and defendant brings error. Reversed and remanded, with directions to award a new trial.

Harry T. Klein, of New York City, E. C. Maxwell, of Pensacola, Fla., and Palmer Pillans, of Mobile, Ala., for plaintiff in error.

Francis B. Carter, of Pensacola, Fla., for defendant in error.

William H. Watson and S. Pasco, Jr., both of Pensacola, Fla., amici curiæ.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge. The defendant, the Texas Company, entered into a contract with the plaintiff, Pensacola Maritime Corporation, for the sale to it of—

---

⊚⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"all of the bunker oil sold by the purchaser [plaintiff] to vessels in the port of Pensacola, Florida, from August 1, 1919, to September 30, 1920. Seller is not obligated to deliver more than 20,000 barrels in any calendar month, except as follows: (1) The purchaser shall have the right to take an additional 15,000 barrels in any month or a total of 35,000 barrels on 10 days' written notice to the seller. (2) The purchaser shall have the right to take a further additional 15,000 barrels in any month or a total of 50,000 barrels on 30 days' written notice. But in case the purchaser gives notice of such additional requirements purchaser shall be .obligated to take the oil called for in such notice at the time indicated. Prices are f. o. b. at purchaser's vessels alongside seller's dock at Pensacola, Florida; seller to pump aboard ship; seller's responsibility ends at ship's rails. * * * Terms: Cash on completion of delivery. Place of payment: Seller's Pensacola office."

The contract made the printed conditions on the reverse side thereof, so far as applicable, parts of the contract. The portions thereof pertinent to this case are the following:

"By this memorandum the seller sells and agrees to deliver and the purchaser purchases and agrees to pay for the goods mentioned within. Unless otherwise stated in this memorandum, delivery shall be deemed complete when goods properly consigned are placed free on board boats, and no stipulation, agreement or understanding of the parties shall be valid or enforceable unless embodied in this memorandum or covered by these provisions. * * *

"Payments: * * * A failure to pay any amount when due may at the option of the seller terminate the contract as to further deliveries and no forbearance or course of dealing shall affect this right of the seller."

No orders were given by the plaintiff for oil thereunder until March 30, 1920, when an order for one vessel was given. During April, 1920, orders for oil for six other vessels at Pensacola, Fla., were given by plaintiff and filled by defendant. On April 23d and May 1st, the plaintiff notified the defendant of additional requirements for oil for vessels at Pensacola to arrive during May. On May 3, 1920, about 5 p. m., defendant's agent delivered to plaintiff a notice, dated May 2d, stating that defendant thereby canceled said contract as of 6 o'clock a. m., May 3d. The cancellation was stated to be authorized by the terms and conditions of the contract, particularly the paragraph entitled "Payments."

No further deliveries of oil were made after said time. At the time said notice was given, the plaintiff had paid for all oil previously delivered, no notice of any purpose to insist on payment being made at the time provided by contract, or of a purpose to cancel the contract as to future deliveries, was given except the notice delivered on May 3d. Plaintiff immediately notified defendant that it denied having breached the contract, and demanded a specification of the breaches claimed by defendant; also that it had sold all oil provided for by the contract, 50,000 barrels per month, and would take and pay for the same. No reply to this letter appears in the record.

Suit was commenced on June 7, 1920, for breach of said contract. In an amendment to its declaration, plaintiff averred that, in addition to the consideration stated in said contract, the plaintiff, at and before the making thereof, promised defendant that it would endeavor to sell to such vessels the fuel oil mentioned in said contract, and that to accomplish this end plaintiff's officers and agents would solicit orders,

and it would send a representative to Europe to endeavor to sell such oil, and to establish agencies for the sale thereof. The damages claimed were the difference between the contract price and the market price of the oil demanded by plaintiff, to wit, 35,000 barrels for May, and 50,000 barrels for each of the months, June to September, both inclusive, or 235,000 barrels, at the times for delivery. The market price for each month was stipulated, subject to defendant's right to object to its introduction in evidence.

No demurrer or exception was filed by defendant to the original or amended declaration. The defendant pleaded:

(1) That at the time of entering into said contract plaintiff was not and never had been engaged in the business of dealing in bunker oil.

(2) That plaintiff was not and never had been so engaged at said time, and made no sales for more than seven months after July, 1919.

(3) After repeating the averments of the last plea, it pleaded that any sales then made were at a time when the price of bunker oil had advanced much beyond that named in said contract.

By amendment to each of these pleas, it denied that it entered into the contract set up in the amended declaration.

(4) It further pleaded that, by the terms of the contract, payments were to be made on completion of delivery at defendant's Pensacola office, that a failure to pay any amount when due might at the option of the seller terminate the contract as to further deliveries, and that no forbearance or course of dealing should affect this right of the defendant; that prior to the giving of the notice of May 3d, stated in said declaration, and to the refusal of the defendant to deliver oil, plaintiff had failed to pay, when due, the amount due the defendant for oil previously ordered by plaintiff and delivered.

The plaintiff joined issue on all of said pleas, and in addition filed a special replication to said fourth plea, averring that all oil had been paid for before the giving of the notice of May 3d, and that defendant had never given any notice that it insisted on payments being made at the time provided by said contract, nor that it would terminate the contract as to future deliveries for failure to make any payment promptly when due. A demurrer to this replication was made and overruled, and issue joined thereon. Subsequently the defendant admitted the truth of the statements therein made.

The court charged the jury that, if they found for the plaintiff, they must find the amount of difference between the contract price and the market price at the several times fixed for delivery on 235,000 barrels of oil, to be delivered 35,000 barrels in May, 1920, and 50,000 barrels in each of the months, June to September, both inclusive, with interest at 8 per cent. from the 1st of each succeeding month, $559,167.89. The jury returned a verdict for the plaintiff for said amount.

The questions raised in this case, and insisted upon in the argument, were:

(1) That the contract was void for want of consideration, plaintiff not having, at the time it was made or before said time, ever engaged in the business of selling bunker oil, and not binding itself to take any particular quantity of oil.

(2) That the effort to show a further consideration for the contract in an undertaking to use the force of the plaintiff in this country and its agent in Europe to promote the sale of defendant's oils was an attempt to add to a written contract an additional clause not claimed to have been subsequently made.

(3) That the evidence in said case did not prove said alleged additional consideration.

(4) That the plea alleging the failure of plaintiff to pay when due the sums owed for oil furnished was good, and that the replication alleging payment of all sums by plaintiff before, and without, any notice by defendant of an intention to demand prompt payment, or to exercise the option to declare said contract terminated if such payment was not promptly made, was not a good reply, and that the court should have sustained the demurrer to said replication.

(5) The errors assigned to the charge were: The failure to give several requests of the defendant, and the instruction given that, if the jury found for the plaintiff, they must find the amount figured out on the tabulated statement furnished by plaintiff, amounting, principal and interest, to $559,167.89.

[1] 1. We do not think the original contract as made was invalid for want of mutuality. The only basis of this contention is that the purchaser had no established business in the sale of bunker oil at Pensacola, and it is insisted that therefore its undertaking to take all of the oil it might be able to sell to ships at Pensacola during a fixed period was too indefinite an undertaking to afford a consideration for defendant's promise to sell to it all oil it might so need. It seems to us that the objection does not arise on the validity of the contract, but would relate alone to the possible ability to prove specific damages in case of a breach.

The contract was an undertaking on the purchaser's part to buy all of its requirements at Pensacola from the defendant. It clearly agreed not to buy for such requirements during the terms of said contract, except from the defendant. The defendant agreed to sell to plaintiff all such requirements up to certain fixed quantities. Here was the consideration of a promise both to do and to refrain from doing a certain thing as a consideration for the promise to sell certain goods at fixed prices. It was not a mere undertaking to buy what plaintiff might desire, but an undertaking to take all of its needs from defendant alone, within the quantities stated.

If the purchaser, during the first 60 days of the contract, had placed contracts with ships coming to Pensacola for all of the oil contracted to be furnished, could the seller have declined to furnish the oil, on the ground that the contract was too indefinite to be binding? Or if the purchaser, during each month of the contract, had required oil for ships at Pensacola to the full amount called for by the contract, and had declined taking it from the seller, would not the seller have had a good cause of action against the purchaser?

There would have been no failure of certainty as to the proof of the damages in such cases. The obligation to take all oil needed in its business of furnishing bunker oil to ships, which business, though new,

was being actively pressed, was as binding an obligation as if the promisor had been previously engaged in the business of furnishing such bunker oil. While the results of such business were not apparently as certain, the obligation was as fixed, and furnished a sufficient consideration for the promise to sell to it such oil.

[2] Even if actual damages could not be proven, or could be shown with legal sufficiency only to a small amount, the right to recover damages legally proven, or at least nominal damages, would exist. Fidelity & Deposit Co. v. Aultman, 58 Fla. 228, 230, 50 South. 991. The objection that, in the absence of an established business, damages for a breach cannot be definitely shown, seems to us to go to the quantum of damages properly provable, when such contract is breached, and not to the validity of the contract as a binding obligation. A well-considered case holds:

"The contract did not lack mutuality of obligation. While defendant promised to buy of plaintiff all the lumber of a certain quality that plaintiff might own during the season, plaintiff bound itself, if it did manufacture or acquire any such lumber, to sell all of it to defendant and to no one else. Thus plaintiff deprived itself of the right to sell lumber to whom it pleased. The promise to restrict its freedom by giving up its right to sell to others was real and definite. It was the substantial and contemplated consideration for defendant's promise to buy all that plaintiff might own during the season. There was the mutuality of obligation essential to a bilateral contract; there was the consideration essential to the validity of any contract. Conley Camera Co. v. Multiscope & Film Co., 216 Fed. 892, 133 C. C. A. 96; Burgess Sulphite Fiber Co. v. Broomfield, 180 Mass. 283, 62 N. E. 367. That the plaintiff did not bind itself to acquire or manufacture any such lumber is immaterial. Its promise to deal with defendant was the valid consideration for the obligation by defendant—a consideration that made the undertaking of the other party binding and enforceable. With regard to the question of uncertainty, a contract is void (save for the possibility of reformation in equity), because of uncertainty, only when it is so worded that the intention of the parties cannot be deduced therefrom. If the intention be clear, the mere uncertainty of the amount involved does not invalidate the obligation, however it may affect the possibility of proving damages for a breach. In the present case the preliminary negotiations demonstrate that defendant wanted to secure all such lumber that it possibly could obtain, without limit, and without binding plaintiff absolutely and under all circumstances to deliver any lumber. The parties had a right to make such a contract, even though the amount that would be deliverable thereunder was not specified, and was in a sense optional with the vendor; and this they did, in terms which are clear and certain." Ramey Lumber Co. v. John Schroeder Lumber Co., 237 Fed. 39, 43, 44, 150 C. C. A. 241, 245, 246.

As has been well said:

"Though it may be true that a seller by ceasing to manufacture may relieve himself from any performance, and still keep a promise to sell all the goods he manufactures, and similarly a buyer by going out of business may avoid performance, while still observing the terms of an agreement to buy all that he requires, these results can be obtained only by doing something which is in itself a legal detriment, namely, the cessation of business. Even a promise to buy or sell only as much as the promisor chooses is a sufficient consideration, when coupled with the agreement that whatever the buyer or seller chooses to buy or sell he will buy from or sell to the promisee. To put the matter in another way—the promise of a seller not to manufacture, except for the buyer, or the promise of a buyer not to buy, except from a particular seller, is clearly a promise to do something detrimental. A few cases seem to admit that, though a contract to buy and sell the requirements or output of a particular factory is a valid contract, an agreement which gives the buyer an

option to take no goods is invalid, although the buyer agrees that, if he should buy any goods of the kind in question from any one, he would buy them from the seller. These decisions cannot be supported. Though a court will be reluctant to give a contract a construction which gives the buyer so wide a power, unless the language of the contract clearly requires that construction, but will rather seek to find the more reasonable intention that the seller has agreed to sell and the buyer to take the buyer's normal or ordinary needs, subject to the slight variation of business continuing on substantially the same scale, yet, if the wider power is given, the contract is not without sufficient consideration." 1 Williston on Contracts, § 104.

In the case at bar the contract provided against the purchaser being induced, by a fall in the price of oil, to refrain from supplying bunker oil to vessels at Pensacola by the agreement of the seller to reduce its price to meet such a condition. See, also, Ellis v. Dodge Bros., 246 Fed. 764, 159 C. C. A. 66; T. W. Jenkins v. Anaheim Sugar Co., 247 Fed. 958, 960, 160 C. C. A. 658, L. R. A. 1918E, 293; 1 Page on Contracts (2d Ed.) §§ 579, 580.

We do not think that the cases declining to sustain such contracts, as valid obligations, are sound in principle, or in consonance with the better authority. We question if this case would fall in that class where the purchaser did not have an established business. While the plaintiff had not previously dealt in bunker oil, it had an established business of supplying fuel to ships coming to Pensacola. It had for quite a time dealt in supplying coal to vessels as fuel. It was adding to that fuel the additional fuel—oil.

[3] 2. By the amended declaration the plaintiff alleged as a further consideration for the contract that at the time of, or prior to, executing the contract sued on, it undertook with defendant to use its employees in the United States, and to send an agent to Europe, to promote the sale of the defendant's oils, and that it did so. No demurrer or objection to these allegations is shown by the record; but the defendant filed its plea denying their truth.

Considerable correspondence showing that plaintiff, just before the contract entered into was signed, in the city of New York, had in said city an agent bound for Europe for the purpose of promoting its business, including the seeking of contracts to furnish fuel to vessels, including bunker oil, and that defendant was advised of this fact, and that said plaintiff received and took considerable literature from defendant advocating the use of bunker oil of the defendant company; but no undertaking, on the part of the plaintiff, was shown to send said agent or promote for defendant the sale of defendant's oils. These letters tended to show activity and the incurring of expense on the part of plaintiff in seeking business for itself looking to the sale of defendant's oils. They were objected to by the defendant as seeking to introduce an additional provision to said contract, claimed to have been made before it was executed, and as being illegal for that purpose.

While the objection that this case is an attempt to alter an existing written contract by the introduction of an antecedent or contemporaneous agreement covering the subject-matter might have been good, had the objection been made to the plaintiff's pleadings before joining issue on these averments, a failure to object by demurrer or otherwise, and a plea denying the truth of this amendment so averring, entitled

the plaintiff to prove the same, and it was not error to receive evidence offered in support thereof. Farmers' Union Warehouse Co. v. Wells, 65 Fla. 350, 351, 61 South. 745.

[4] This evidence was also admissible for the purpose of shedding light on what, in the contemplation of the parties, was to be, and was being, done by the plaintiff in performing its undertaking to take all of the bunker oil required by it for vessels at the port of Pensacola, and as bearing upon the value of this obligation of the plaintiff.

[5] 3. We do not think the evidence was sufficient to prove an undertaking by the plaintiff with the defendant to use its employees in the United States, and to send an agent to Europe, to promote the sale of the oil. It was not bound to have carried out any performance of such activities for any time, or, indeed, at all; but what it did seems to have been voluntarily done for defendant's benefit while promoting its own business.

4. Defendant's fourth plea alleged that the plaintiff had failed to make payments for oil delivered under said contract "when due," and that the defendant had canceled the contract as to further deliveries on May 3, 1920. Plaintiff by a first replication denied said plea; by a second replication it replied that it had paid for all oil delivered before said notice of May 3d was given, and defendant had never given any notice that it would insist on payments being made at the time provided by said contract, or that it would terminate the same as to future deliveries for failure to make prompt payments. The court overruled a demurrer to said second replication, and this is one of the errors assigned. The truth of the second replication was subsequently admitted. No proof in support of the plea was offered.

Taking the plea and the replication together, all their averments show is that the plaintiff had failed to pay the sums due immediately on the completion of the delivery of the oil, but that before any complaint had been made by the defendant, or any objection to its course indicated, it had paid all sums due for oil which had been delivered. It is entirely consistent with the averments of the plea that all payments were made in a reasonable time after delivery. It will not be contended that, had this contract contained only the provision that the terms of payment for the oil should be cash upon completion of delivery, the above state of facts would have shown a breach on the part of the plaintiff for which defendant, after receiving payment, lawfully could refuse to comply with the contract. The question, therefore, is whether the further provision of the contract, to wit, that "a failure to pay any amount when due may at the option of the seller terminate the contract as to further deliveries, and no forbearance or course of dealing shall affect this right of the seller," would authorize the defendant to exercise this option, after receiving payment before demand and without objection or notice of a purpose to terminate.

[6] Forfeitures are not favored, and provisions therefor will be strictly construed. "Forfeitures are not favored; and where a contract is ambiguous, and is capable of being so construed as to provide for a forfeiture and so as not to so provide, the courts uniformly hold they will so construe the contract as to avoid the forfeiture." Equi-

table Loan & Security Co. v. Waring, 117 Ga. 599, 656, 44 S. E. 320, 344 (62 L. R. A. 93, 97 Am. St. Rep. 177).

[7] The words, "a failure to pay any amount when due may at the seller's option terminate said contract," do not necessarily mean that the contract is terminated for failure to pay immediately on completion of delivery. It may well mean that a failure to pay when due, while existing, gives to the seller the option to declare the contract for future deliveries canceled. It is insisted that it is the failure to pay when due that gives the option, and that, unless such option is exercised while there is an existing failure to pay what is due, when there is nothing due, there is no option to declare the contract terminated.

[8, 9] The purpose of a right reserved to terminate a contract for nonpayment is in the nature of a security for the payment, and where the only default is nonpayment, it is the usual course of equity to relieve against an exercise of such forfeiture, upon tender of such payment with interest. Pomeroy, Eq. Jur. (4th Ed.) §§ 381, 453; South Penn. Oil Co. v. Edgell, 48 W. Va. 348, 37 S. E. 596, 597, 86 Am. St. Rep. 43. Here the payment has been made and received. Therefore, where the only breach of a contract is the failure to pay promptly, and, before any complaint is made, or the option to terminate exercised, payment has been made, and has been received without objection, or notice of intention to exercise the option to terminate, the case of forfeiture is at an end, and the receipt of the money due is an exercise of the option on the part of the plaintiff not to declare the contract terminated, but to consider it as continuing. That the receipt of a past-due payment waives a provision that time is of the essence of such payment has been declared by a number of courts.

Such payment, accepted, without demur, before any exercise of the option to terminate, is a good reply to the alleged forfeiture. Mound Mines Co. v. Hawthorne, 173 Fed. 882, 886, 97 C. C. A. 394; Stevinson v. Joy, 164 Cal. 279, 128 Pac. 751, 753; Cash v. Mesenheimer, 53 Wash. 576, 102 Pac. 429; Lent v. B. & M. R. Co., 11 Neb. 201, 8 N. W. 431; Monson v. Bragdon, 159 Ill. 61, 42 N. E. 383, 385; Keefe, v. Fairfield, 184 Mass. 334, 68 N. E. 342; McDonald v. Kansas City Bolt & Nut Co., 147 Fed. 360, 79 C. C. A. 298, 8 L. R. A. (N. S.) 1110; Little Rock Cooperage Co. v. Lanier Co., 83 Ark. 548, 104 S. W. 221; Henningsen v. Tonopah, etc., R. R. Co., 33 Nev. 208, 111 Pac. 36, 119 Pac. 774, Ann. Cas. 1913D, 1008, 1018. We have found no case where merely a failure to pay strictly at the time the payment was due, followed by a payment accepted without demur or protest, has been held to leave open the option to thereafter terminate for the default, which no longer exists at the time when the option is attempted to be exercised.

The facts in this case show that seven ships were bunkered under this contract by the defendant for the plaintiff during the month of April; one on April 1st, the others between the 20th and 30th. It is quite consistent with the allegations of this plea that the failure to pay when due may not have extended beyond 24 hours after any one of the payments. In fact, construing this plea against the pleader, it is consistent with but one default in payment having occurred, namely,

that on the first ship. The defendant in its pleadings alleges that the price of the oil had advanced very considerably over the price at which it contracted to fill this contract, and was so advanced at the times when defendant, after receiving without objection payments for oil furnished, undertook to cancel its contract, so that an injury to the plaintiff from such cancellation is apparent. We do not think that the court erred in sustaining the replication, and think it was a good reply to the fourth plea.

5. A number of errors are assigned to the charges given, and to the refusal to give the several requests to charge made by the defendant. These alleged errors are sufficiently disposed of by what has been ruled above, and by what is further recited as to the directions given to the jury by the court as to the amount they must find, if they found for the plaintiff, and as to what is hereinafter said concerning the evidence submitted upon the subject of damages.

The declaration in this case alleged that plaintiff had notified defendant that it would require 35,000 barrels of oil in the month of May, 1920, and 50,000 barrels of oil in each of the following months, to and including September, 1920, which was the last delivery provided for by the contract. The proof in the case as to the oil which plaintiff sold or could have sold was 4,700 barrels to the steamer Munsomo and 10,000 barrels to the steamer Ohioan, which oil the defendant failed to deliver. The plaintiff's president also testified that prior to May 3d he had made a tentative contract for the sale of defendant's oil, demanded in his letter of May 4th to the Texas Company, to wit, 35,000 barrels in May and 50,000 barrels in the five succeeding months, but that it was never consummated, because of the notice of May 3d. No testimony was given or offered as to the nature of such contract, the price at which the oil was to be taken, with whom the contract was made, or whether the oil was for delivery at the port of Pensacola, nor as to how far said negotiation had gone. No other testimony was offered as to actual or probable sales. Whether any proceedings were had to hold plaintiff liable for its failure to furnish oil to the Munsomo or the Ohioan was not shown. The proof was that the price at which this oil had been sold to these vessels was 79 cents per barrel below the market price at the time of sale.

The court charged the jury that, if they found for the plaintiff, the damages would be the difference between the price of grade C oil, named in the contract, and the market price for such grade at Pensacola, Fla., at the several times fixed for delivery, for the quantities required to be delivered, from May 3, 1920, to September 30, 1920, with interest at 8 per cent. per annum on the amount so found from the 1st day of the month next succeeding the month in which the delivery was required, the interest to be calculated up to May 24, 1921. Plaintiff's counsel had prepared a tabulated statement, based upon the delivery of 235,000 barrels of oil during the months May to September, 1920, as being due by the defendant to the plaintiff, with interest thereon calculated according to the charge above stated, and had by permission of the court handed the same to the jury. In respect to this statement the court charged the jury that if, under the charge of the

court, they found for the plaintiff, they might use the tabulation in estimating the damages.

After the jury had been out for some time, they were brought back into the court, and upon inquiry by the court stated they would like further instructions as to the amount of damages. Thereupon the court reread to the jury that portion of his charge previously given relating to the measure of damages, adding the words: "The amount is fixed in the tabulated memorandum handed you" (referring to the tabulated statement made by plaintiff's counsel given to the jury). One of the jurors then asked the judge: "Does that mean that, if we find for the plaintiff, we must find the amount in that memorandum?" The trial judge answered: "Yes." To which instructions the defendant excepted.

The defendant requested the court to charge the jury that under the evidence in the case they should find for the defendant; also that, if they found for the plaintiff, the measure of its damages would be restricted to the difference between the contract price and the resale price for all bunker oils which the evidence showed plaintiff had sold for delivery to vessels at the port of Pensacola in the period ending September 30, 1920, and which defendant failed to deliver; also that, if the jury found for the plaintiff, plaintiff was only entitled to recover damages for loss of profits on completed sales of bunker oil made in the port of Pensacola, and such anticipated profits as the plaintiff showed with reasonable certainty would have resulted to the plaintiff had the defendant not canceled said contract, and that the average profit per month made by the plaintiff on sales during the first nine months of the contract constituted the basis during the remaining five months. Defendant also requested the court to charge that the damages should be estimated upon the number of barrels of oil which the evidence showed the plaintiff had sold, or procured contracts for the sale of, to vessels in the port of Pensacola, and such other oil as plaintiff could have sold during the remaining months of the contract, had the performance thereof not been terminated. All of such charges the court refused, and the defendant excepted.

[10] We think that the court erred in instructing the jury that, if they found for the plaintiff, they must find the amount shown in said tabulated statement. This treated said contract as one for the purchase of 235,000 barrels of oil by the plaintiff from the defendant, which the defendant was bound to deliver, and that the plaintiff was entitled to recover the difference between the contract price and the market price, on this number of barrels; whereas we think that this contract was one by which the defendant obligated itself to furnish to the plaintiff, and plaintiff bound itself to take from the defendant, all of the oil which it needed to supply vessels at the port of Pensacola. The correspondence in the case shows clearly that the first contract proposed was one which contemplated the sale of the defendant's oil by plaintiff at ports other than Pensacola, that defendant objected to making this contract, and that the contract entered into was expressly limited to the furnishing of oil to plaintiff for supplying vessels at said port of Pensacola. The contract itself clearly indicates this, as the deliveries by the

contract are called for to be made "at purchaser's vessels alongside of the seller's dock at Pensacola, Fla., seller to pump aboard ship"; and while it is true that certain rights are given to the purchaser to call for greater amounts of oil per month than the 20,000 barrels originally specified as the limit, and where plaintiff does give such notice it is obligated to take said oil, it is still to be oil sold by the purchaser for delivery to vessels at the port of Pensacola, Fla.

We think, therefore, that the court should have charged the jury, as requested, that the number of barrels of oil to be computed was such as the plaintiff had sold, or procured contracts for the sale of, to vessels in the port of Pensacola, and such other oil as from the evidence it appeared that plaintiff could have sold during the remaining months of the contract had its performance not been terminated.

[11] We also think that, under the evidence as adduced in this case, no basis was shown for recovery, except as to the oil which plaintiff had contracted to sell to the vessels Munsomo and Ohioan. This was the only proof of any sales actual, or sufficiently probable, to be the foundation for the allowance of damages. We do not think that the evidence of Mr. Knowles, president, was proof of a contract for future sale of oils in compliance with the contract between plaintiff and defendant sufficient to be a basis for recovery. It appears that no contract had been concluded; it might never have been concluded, had there been no breach of the contract between plaintiff and defendant. It may not have related to vessels taking bunker oil at the port of Pensacola. The terms of the contract may have been such that no profit whatever would have accrued to the plaintiff therefrom, and the evidence was wholly insufficient as a basis for estimating damages.

[12] 6. As to the amount of damages to be recovered on the sales to the Munsomo and Ohioan, we think, under the proof offered in this case, it should have been limited to the loss of the profits on these two contracts; that is, the difference between the contract price due to the Texas Company and the selling price made to these two vessels. The evidence in the case shows that plaintiff did not go into the market and purchase oil to supply these contracts. Under its contract with defendant, it could only sell bunker oil at Pensacola. Unless, therefore, the evidence showed that it had been held liable for failure to supply such oil to said vessels, or that such liability was asserted, all that it has lost according to the evidence, has been its profits on these two contracts.

[13] The purpose of the law is to award to the plaintiff the actual damages he has sustained. Foss v. Heineman, 144 Wis. 146, 128 N. W. 881. The rule that, where a contract for the sale of goods is breached, the measure of damages is the difference between the market price and the contract price, is only a rule for the ascertainment of damages which have been suffered, and where the evidence shows that the actual damages suffered has been less than such difference the recovery should be limited to such actual damages. Cincinnati Gas Co. v. Western Siemens Co., 152 U. S. 200, 204, 205, 14 Sup. Ct. 523, 38 L. Ed. 411; 3 Williston on Contracts, § 1386; Isaacson v. Crean (Sup.) 165 N. Y. Supp. 218; Wertheim v. Chicoutimi Co., 1911 A. C. 301; Foss v. Heineman, 144 Wis. 146, 128 N. W. 881.

For the errors above mentioned, the judgment of the District Court is reversed, and the case remanded, with directions to award a new trial.

Reversed and remanded.

WALKER, Circuit Judge (dissenting in part). I concur in the foregoing opinion, except the part of it which deals with the demurrer to the special replication to plea 4. In my opinion that demurrer should have been sustained. It was clearly disclosed by that replication that nothing but the defendant's acceptance of the payment after it was due, without giving notice of its exercise of the option to terminate the contract, as to further deliveries, was relied on to support the claim that the option had ceased to exist when the defendant undertook to exercise it. By the contract the defendant agreed to make sales of oil only for cash on delivery. A failure to pay any amount when due conferred on the defendant the option to terminate the contract as to further deliveries, and it was expressly stipulated that "no forbearance or course of dealing shall affect this right of the seller." The option was given as a means of enabling the defendant to terminate its obligation to make sales of oil to the plaintiff in the event of the latter's "failure to pay any amount when due."

In my opinion the quoted provision is deprived of the effect its language shows it was intended to have by a decision that the seller lost that right by merely failing to exercise it prior to or at the time of its acceptance of the amount of a payment which was not made when it was due. The writer understands that the law of election, or of estoppel or waiver, must be relied on to support a claim that a party having two contract rights loses one of them as a consequence of his exercising the other. Upon the happening of the alleged failure by the plaintiff to make a payment when it was due, the defendant was not put to an election between terminating the contract because of that default and accepting payment of the overdue amount, as, upon the happening of the default, it had both the right to exact payment of that amount and the right to terminate the contract as to further deliveries because of the failure to pay that amount when it was due. The exercise of one right was not inconsistent with the exercise of the other. The law of election is applicable only when the rights or remedies which may be availed of are inconsistent. Thomas v. Sugarman, 218 U. S. 129, 30 Sup. Ct. 650, 54 L. Ed. 967, 29 L. R. A. (N. S.) 250; Robb v. Vos, 155 U. S. 13–43, 15 Sup. Ct. 4, 39 L. Ed. 52; 2 Williston on Contracts, § 688, pp. 1331, 1332.

The acceptance of the amount overdue for oil already delivered was entirely consistent with a termination of the contract as to further deliveries. No ground of estoppel is disclosed. It is not made to appear that the plaintiff changed its position to its prejudice between the time of the failure to make a payment when it was due and the time of the defendant's exercise of the option to terminate the contract as to further deliveries. Even if the stipulation in question had not contained the provision against the seller's right to terminate being affected by any forbearance or course of dealing, that right was exercisable within a reasonable time. There is nothing to indicate that the exercise of

the right was unduly delayed, or that the plaintiff was prejudiced by the delay. If it was exercised with reasonable dispatch, and before the situation of the plaintiff was materially changed, it would not lie in the mouth of the latter to complain of a delay by which it was not affected, though the stipulation as to forbearance had been omitted. Pence v. Langdon, 99 U. S. 578, 25 L. Ed. 420. But that stipulation was a valid one, and it should be accorded the effect it was intended to have. It stood in the way of the defendant losing the right to terminate the contract by merely failing to exercise that right before an overdue payment was made and accepted. The pleadings in question show that in the contingency which arose the defendant had the right to terminate the contract as to further deliveries. In the opinion of the writer there was not disclosed any act or omission of the defendant which had the legal effect of depriving it of that right. It is not believed that one waives or otherwise loses a contract right in consequence of conduct which is entirely consistent with the existence of an intention on his part to retain that right and to exact the enforcement of it.