WILLIAM C. ATWATER & CO., Inc., v. TERMINAL COAL CORPORATION.
No. 7280.

District Court, D. Massachusetts.
March 15, 1940.

Charles J. Miller, of Boston, Mass., for plaintiff.

Alexander Whiteside, Warren Garfield, Whiteside & Lamson, and David Stoneman, all of Boston, Mass., for defendant.

FORD, District Judge.

This case involves the rights of the parties under a written contract for the

sale and delivery of coal. The material parts of the contract are as follows:

"Coal Contract

"New York, March 21st, 1934.
"Old Colony Coal & Wharf Company
"114 State Street, Boston, Mass.

"Bought of William C. Atwater & Company, Inc., Agent
"Atwater Pocahontas Smokeless Coal
"Requirements, not exceeding

| 50,000 | Tons | R.O.M. | See statement attached. |
| 100,000 | " | Slack 5/8" | " " " |
| approximately 70% Slack 5/8" | " | Stoker 1¼" | " " " |

"Delivery    See statement attached.
"Contract effective April 1st, 1934, Contract expires March 31st, 1935.
"Remarks    For shipment to New England as ordered by Old Colony Coal & Wharf Co., Boston, Mass.    (Excluding Fall River, Mass., and territory adjacent thereto.)

"William C. Atwater & Company, Inc., Agent
"By Geo. H. Lachnicht, Sales Manager.
"Old Colony Coal & Wharf Company
"March 26, 1934.    By Jos. W. Gorman, V.P."

On a statement attached and made part of the contract appears the following:

"Delivery: Unless otherwise mutually agreed, the coal covered by this contract shall be taken by the buyer as follows:

"Run of Mine. During the months of May, June, July, August, September and October, 1934, approximately 3,000 tons monthly; during the months of April, November and December, 1934, and January, February and March, 1935, approximately 5300 tons monthly.

"Slack, ⅝". During the months of May, June, July, August, September and October, 1934, approximately 4,000 tons monthly; during the months of April, November and December, 1934, and January, February and March, 1935, approximately 7700 tons monthly.

"Stoker, 1¼". During the months of May, June, July, August, September and October, 1934, approximately 1800 tons monthly; during the months of April, November and December, 1934, and January, February and March, 1935, approximately 3200 tons monthly."

In the conditions attached to the contract appears the following: "5. The coal covered by this contract is to be used only in the yards or plants of the Buyer, and is not to be diverted by the Buyer to other purposes without the consent of the Seller."

The defendant Terminal Coal Corporation was organized May 29, 1928 under the name of Old Colony Coal & Wharf Company (hereinafter called Old Colony) for the purpose of conducting a coal company in New England. The change to Terminal Coal Corporation occurred August 11, 1934. The company owned a lease of part of the Mystic Wharf in Boston and handled shipments of coal at tidewater for sale in New England. Old Colony remained in business until August, 1934, when it sold its assets and good will to the Carter Coal Company (hereinafter called Carter) and then liquidated.

On September 7, 1928, Old Colony and the North American Coal Corporation (hereinafter called North American), the latter an Ohio corporation, of which one Frank E. Taplin was president and had the controlling interest, entered into an agreement by which Old Colony agreed to purchase its requirements of coal through North American. Taplin was an original subscriber and owner of 50% of the total capital stock of Old Colony and was also its president. Joseph W. Gorman was vice president of Old Colony, as owner and original subscriber of a quarter interest in the stock of the latter, and had full charge of the management of it from 1929 until the sale to Carter in 1934. Gorman was also a vice president of North American.

From about 1912 to 1935 North American was the exclusive selling agent for Atwater coal in the Middle West and Great Lakes territory. Outside this agency agreement the plaintiff (hereinafter called Atwater) sold its coal to North American for shipment to New England and up to 1934 all coal shipped to Old Colony's Mystic Wharf was sold and consigned on account of North American.

In November, 1933, Gorman requested Atwater thereafter to send its invoices for coal to Old Colony rather than to North American. The North American had and did guarantee payment for all coal actually shipped to Old Colony. In 1933, shipments were being made to Old Colony under a contract between Atwater and North American dated June 1, of that year. This contract was to expire by limitation March 31, 1934. On March 21, 1934, the present contract in suit was entered into between Atwater and Old Colony, the latter, as stated, being substituted for North American by consent of all parties. The contract was executed in New York.

The main controversy in this case centers around the construction of this contract.

The plaintiff contends that it is a bilateral contract for the sale of a definite and specific quantity and tonnage of coal, to wit, 150,000 tons. On the other hand, the defendant contends it should be construed as an ordinary "requirements" contract, i. e., for the coal requirements of Old Colony not exceeding 150,000 tons.

■ To construe the type of contract in suit, it is necessary to look for the "dominant measure" of the material to be furnished, Smoot v. United States, 237 U.S. 38, 42, 35 S.Ct. 540, 59 L.Ed. 829. Other cases have employed other phrases, such as, "determinative words", Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622, "dominating specification", Marx v. American Malting Co., 6 Cir., 169 F. 582, and "determining words", Budge v. United Smelting & Refining Co., 9 Cir., 104 F. 498, 500.

■ In the contract in suit Old Colony stated its requirements as not exceeding a certain amount. This language seems plain. The very essence of a requirements contract is that the amount needed cannot be exactly defined at the beginning of the year and it is for this reason that a contract of this type which deals with future needs is entered into. The natural and plain meaning of the contract in suit is that the needs, or requirements, of Old Colony for coal for the period of the contract would not be more than 150,000 tons and might be less. Thus, it would appear that the measure of the coal sold was "the requirements of the defendant for the period stated." The contention of Atwater that the "150,000 tons"

is the dominant measure is without merit. To accept such a construction would be to give no effect whatsoever to the word "requirements." This would be avoiding the plain meaning of such an expression, well known in coal and other contracts for material. We cannot take the word "requirements" from the context and cast it aside as meaningless, as the plaintiff would want us to do, nor can we restrict its plain meaning in such a manner as to make it entirely nugatory.

The two cases mainly relied on by the plaintiff, Budge v. United Smelting & Refining Co., supra, and Taxi Service Co. v. Gulf Refining Co., 252 Mass. 314, 147 N.E. 863, do not warrant a contrary conclusion. The Budge case hinged on the fact that the Court construed the contract to mean that the buyer expressly promised to pay for definite amounts of timber of two different kinds. Here, the promise was to pay for "requirements" and not for any definite amount. In the Taxi Service case, 252 Mass., page 321, 147 N.E. 863, the Court intimates it would have given effect to the word "required," if it were present in the contract itself. Certainly, the word "required" in the Budge case would have been given effect if the buyer needed more than the minimum amounts named for which he expressly agreed to pay.

■ The fact that in the statement attached to the contract and made a part of it deliveries for specified tonnages were provided for does not make it a contract for a definite tonnage. This clause was obviously inserted, as such provisions usually are, for the convenience of the seller and was a provision for deliveries of hoped-for orders. The coal was to be shipped as the contract itself said, "as ordered," and the evidence in the case showed that the clause relating to delivery of the tonnage specified therein was merely for the purpose of preventing the plaintiff-company from having any "free coal" (coal mined but not ordered) on hand at any time. Atwater preferred, for obvious reasons, not to mine coal until ordered. This specification of quantities was not controlling and did not have the effect of compelling a determination that the contract in suit was for a definite amount of coal. Cf. Kellogg et al. v. Norman, 74 N.Y. 596; Texas Co. v. Pensacola Maritime Corp., 5 Cir., 279 F. 19, 24 A.L.R. 1336; National Publishing Co. v. International Paper Co., 2 Cir., 269 F. 903;

182

Worcester Post Co. v. W. H. Parsons Co., 1 Cir., 265 F. 591.

Although the plain meaning of the terms of the contract seemed to require that it be construed as a requirements contract, yet in view of the possibility that there might be some ambiguity present, the defendant was permitted to introduce oral evidence concerning the circumstances surrounding its execution and the following conduct of the parties concerning it. Vice president Gorman of Old Colony, who had been in the wholesale coal business for about thirty-five years, in the negotiations for the contract in suit, testified, and I find it to be a fact, that he reminded the representatives of Atwater that Old Colony was for sale and a buyer would not want to take it with a contract "for definite tonnages." The representatives of Atwater assured Gorman, who was representing Old Colony, "that we will make it a requirements contract and you can take care of yourself that way. We will make it a requirements contract the same as you took care of yourself last year." This evidence was not denied in any particular by Atwater. The evidence showed the 1933 contract between Atwater and North American (Old Colony being substituted for the latter in the 1934 contract) was a requirements contract, with a minimum of 125,000 tons and a maximum of 250,000. Atwater drew the contract in suit and had knowledge of the proper use of terms to assure a specific tonnage being taken by Old Colony, as is evidenced by the minimum requirements in the contract which it drew in 1933. Just after the contract was signed, on April 7, 1934, one Lachnicht, an authorized representative of the plaintiff-company, wrote to North American stating that Atwater was contemplating "making contract with the Old Colony * * * for their requirements of * * * coal." When vice president Gorman of Old Colony notified Atwater on August 25 that it would take no more coal because of the sale of the company to Carter, he stated, "there will be no further requirements for coal for this company." This construction of the contract was not challenged by Atwater. In fact, the evidence showed it was not until sometime in 1936 that the plaintiff-company ever made any contention that it had a claim against Old Colony because of any breach of agreement and this was at a time demand was being made against Atwater to settle its indebtedness to Old Colony. The evidence was volumi-, nous, but these outstanding facts fortify the conclusion reached that the agreement by its terms was a "requirements" contract.

The evidence further showed Old Colony took no coal during the months of April, May, and June and there was no complaint made by the plaintiff for its not doing so. It had considerable coal on hand when the contract was signed and it was understood and agreed to by Atwater that Old Colony would take no coal during the months of April, May, and June. After inquiry by Atwater on July 11, 1934, almost four months after the contract was signed, Atwater did request Old Colony to take coal under the contract and about 7,000 tons, which as far as the evidence showed was the extent of its requirements, were ordered by it during the months of July and August up to the time of the sale of Old Colony to Carter.

This evidence leads to the conclusion that at the time the contract was made, it was the intention of the parties to make a contract in which the buyer did not agree to buy any specific quantity, but only its requirements. Stern v. Premier Shirt Corp., 260 N.Y. 201, 183 N.E. 363; McNutt Co. v. Eckert, 257 N.Y. 100, 177 N.E. 386; Schlegel Mfg. Co. v. Peter Cooper's Glue Factory, 231 N.Y. 459, 132 N.E. 148; Edison Electric Illuminating Co. v. Thacher, 229 N.Y. 172, 128 N.E. 124; Wigand v. Bachmann-Bechtel Brewing Co., 222 N.Y. 272, 118 N.E. 618; New York Central Iron Works Co. v. United States Radiator Co., 174 N.Y. 331, 66 N.E. 967; Petroleum Freight Lines Corp. v. Better Gas & Oil Co., 157 Misc. 1, 282 N.Y.S. 671; Asahel Wheeler Co. v. Mendleson, 180 App.Div. 9, 167 N.Y.S. 435; Texas Co. v. Pensacola Maritime Corp., supra; Eustis Mining Co. v. Beer, Sondheimer & Co. Inc., D.C., 239 F. 976; T. B. Walker Mfg. Co. v. Swift & Co., 5 Cir., 200 F. 529, 43 L.R.A.,N.S., 730; Marx v. American Malting Co., supra; Williston on Contracts, Rev. Ed., Vol. I, Sec. 104A, p. 354, note 3.

Where the buyer agrees to take from the seller all his requirements for a certain period, as was the case here, the subject matter is the buyer's requirements during the period specified. Consequently, if the buyer has requirements, he must take them from the seller or be in default. This presents the question whether, during

the period specified in the contract, Old Colony had requirements that it failed to take from Atwater.

■ When Carter bought the business it took over all the assets of Old Colony, including the equipment, leases for wharf facilities and office premises, all coal and coke on the wharf, a coke franchise, and "all the contracts owned by Old Colony covering the sale of coal and coke by Old Colony to purchasers," in accordance with a schedule of contracts attached to the sale agreement. In this schedule appeared contracts for about 200,000 tons of coal. Old Colony in an agreement dated July 27, which was closed on August 9, obligated itself not to enter into any contracts for the sale of coal, to close its offices, and not engage in the solicitation of sales of low volatile coal and not sell any high volatile coal except through an agency not affiliated with Old Colony or North American for a period of five years. In other words, Old Colony sold its complete business to Carter and as a result was entirely out of business.

The plaintiff contends that not only did Old Colony have requirements after August 9, as evidenced by the contracts, but it also had requirements before that date and points to the existence of these contracts to support this assertion. Outside of these contracts there was no evidence upon which the plaintiff relied to prove actual requirements on the part of Old Colony. The evidence shows, and I find it to be a fact, that the contracts were capable of being satisfied to a substantial amount by Atwater. However, there was absolutely no evidence introduced as to the terms of these contracts nor was there any evidence offered to show whether under these contracts there were any undelivered tonnages. None of the purchasers in these contracts testified at the trial. They were executory contracts for the sale of coal. It was summertime when the contract with Carter was executed. There was no evidence that Old Colony up to the time it went out of business needed or required any coal to fill these contracts. As shown above, it had considerable quantity of coal on hand when the contract was signed. It ordered about 7,000 tons from Atwater up to sometime in the early part of August. There was no evidence of any arbitrary withholding or attempts to evade requirements and there is no evidence from which this fact can be inferred. Certainly one would suppose under the contracts sold to Carter that at some time or other that Old Colony would have actual requirements to satisfy them but there was no evidence introduced in the case to show it had these requirements before August 9. These contracts, at best, might be regarded as evidence of possible requirements but they do not in and of themselves in the absence of any evidence of undelivered tonnages prove the existence of actual requirements before the sale to Carter. And when Old Colony went out of business and turned these contracts over to Carter, Old Colony had no requirements concerning them. Carter had the requirements from that time on and naturally would supply them from its own product. Atwater admitted this was to be expected. The argument of the plaintiff that the existence of these contracts and their sale to Carter connotes bad faith, dishonest sale and the presence of requirements is not convincing. It would not be unusual for Old Colony or any other coal company to have contracts for the sale of coal in the ordinary course of its business, nor was there anything unusual in a company selling its business, with unfilled executory contracts on hand, in order to escape further indebtedness.

■ The plaintiff next argues that the evidence showed that the Old Colony discontinued its business in bad faith; that it went out of business in order to avoid having requirements and thus defeat the plaintiff's rights under the contract. However, the evidence does not support this contention.

The facts showed that losses were sustained by Old Colony in each of the years 1931, 1932, and 1933. The balance sheet on December 31, 1933 showed a capital deficit of $162,087.75. Vice president Gorman of Old Colony did express in a letter written to the plaintiff that he was very optimistic about business in 1934, but this statement was not at all conclusive that business was promising, especially in view of the fact that he had made the same statement to North American in the years preceding 1934 and proved to be wrong. In 1934, at the time the sale of the business was made to Carter, Old Colony still had a very large deficit. The balance sheet on December 31, 1934 did show a reduction of $90,000 in the deficit, but the evidence did not show that this was an operating profit. It seems that this reduction was occasioned by considera-

tion received from the sale of the business to Carter. The facts further showed that Taplin, president of North American, was complaining of losses to Gorman of Old Colony as far back as August 20, 1933 and was still complaining of the losses in letters written by him to Old Colony in April and May, of 1934, after the contract in suit was signed and a few months before the sale. The evidence also showed that the business was offered for sale to Atwater itself before the contract in suit was signed and before its actual sale to Carter. Atwater had its chance to buy and declined it. The contention of Atwater that Taplin's control of Old Colony indicated bad faith is without foundation. Taplin, although he had the controlling interest in Old Colony, had a right to protect his investment by sale at an opportune time, provided the sale was made in good faith. Nor has the contention of the plaintiff that there was bickering going on in Old Colony between some of the stockholders and Taplin any weight in this connection. It was admitted by Atwater that Carter was in entire good faith in purchasing the business. Finally, the evidence was conclusive that the business had been losing money and there was no testimony in the case that would warrant a finding that a continuance of Old Colony's business would result in anything but additional indebtedness. The evidence also shows that the market was in an unsettled state. There was no evidence the sale was made to defeat the plaintiff's right under the contract in suit. The mere fact it had contracts on hand for the delivery of coal is not controlling as to better prospects. There was entire absence of evidence as to what effect the filling of these contracts would have on Old Colony's business. It is my conclusion that the sale to Carter was made in absolute good faith and for the purpose of preventing any further financial losses by Old Colony.

The plaintiff further contends that, assuming the agreement in suit is a true requirements contract, there was an implied obligation upon Old Colony to continue in business and take all the goods that its business would require if maintained under substantially the same conditions as existed at the time of making the contract. See Williston on Contracts, Rev.Ed., Sec. 104A, pp. 357–359, notes 10 and 12; In re United Cigar Stores Co., D.C., 8 F.Supp. 243; Id., 2 Cir., 72 F.2d 673.

The contract in suit was executed in New York and consequently the law of that jurisdiction governs its construction. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. The plaintiff relies strongly upon the case of Wells v. Alexandre et al., 130 N.Y. 642, 29 N.E. 142, 15 L.R.A. 218, to support its contention in this regard. Cf. Ehrenworth v. George F. Stuhmer & Co., Inc., 229 N.Y. 210, 128 N.E. 108 and Wilson v. Mechanical Orguinette Co., 170 N.Y. 542, 63 N.E. 550.

In the Wells case the defendants made a contract to buy from the plaintiff all coal required for their three steamers for one year. The steamers were sold during the year and the defendants themselves required no coal for them. The Court said, at page 646 of 130 N.Y., at page 143 of 29 N.E., 15 L.R.A. 218, "The fact that the defendants deemed it best to sell the steamers cannot be permitted to operate to relieve them from the obligation to take the coal which the ordinary and accustomed use of the steamers required, for the provisions of the agreement do not admit of a construction that it was to terminate in the event of a sale or other disposition of them by the defendants."

This case at first reading appears to support the contention of the plaintiff. However, it will be noted in this case which represents a minority view as to the right of the buyer in this type of contract to quit his business in good faith (In re United Cigar Stores Co., supra) that the agreement is somewhat different from the agreement involved in the present suit. In the Wells case the contract involved the purchase and sale of an amount of coal which was to be measured not by the requirements of the buyer, but by the requirements of certain named steamers. Although the defendants sold the steamers, they continued to have requirements which were held to fix the amount of coal the defendants had agreed to buy. It could be found from the terms of the contract that it was contemplated by the parties that the steamers would continue in use and the Court viewed it as one that required the buyer to take in any event the amount of coal required in the accustomed use of the vessels and that amount was substantially definite; it could be definitely ascertained. In truth, the Court in effect construed the contract as one for a definite amount.

There was nothing in the contract in suit which showed an intention of the parties to delimit the amount of coal the buyer was to take except the latter's requirements or needs as they arose after the date of the contract. There was no "minimum" amount in the 1934 contract in suit, as there was in the 1933 contract. That limitation had been eliminated. This showed that it was not the intention of the parties that the buyer was obligated to have future requirements. Wigand v. Bachmann-Bechtel Brewing Co., supra, involved a contract of this type. The Court in the case of Edison Electric Illuminating Co. v. Thacker, supra [229 N.Y. 172, 128 N.E. 126], refers to the contract in the Wells case as an "exceptional form of contract." The later New York cases, as is pointed out in In re United Cigar Stores Co., D. C., 8 F.Supp. 243, 245, "have since recognized that there is more elasticity in the usual requirements contract, and that the buyer is not limited to 'the ordinary and accustomed' volume of his supplies; on doubling his business, he may call on the seller to fill his doubled needs."

In New York Central Iron Works Co. v. United States Radiator Co., supra, the Court stated (174 N.Y. at page 335, 66 N.E. at page 968), "The obligation of good faith and fair dealing towards each other is implied in every contract of this character." Moore v. American Molasses Co. of New York, 179 App.Div. 505, 166 N.Y. S. 4; W. P. Fuller & Co. v. Schrenk et al., 58 App.Div. 222, 68 N.Y.S. 781.

Under a "good faith and fair dealing" test, where the contract is one for the requirements of the buyer in the future, the latter would hardly be liable if his requirements shrunk to practically nothing, provided he acted in good faith, and, by the same token, he should not be in default if his needs completely disappeared, as they did here, by sale of his business in good faith.

Although In re United Cigar Stores Co., supra, was decided before Erie Railroad Co. v. Tompkins, supra, yet it appears that the Court was construing the law of New York applicable to a requirements contract.

It is my opinion that the New York Courts would confine the doctrine expressed in the Wells case as applying to contracts of the exceptional form that was involved there and not regard it as applicable in the construction of the type of contract in the present suit. The recent case of Petroleum Freight Lines Corp. v. Better Gas & Oil Co., supra, indicates this conclusion is correct. There was involved in this case a contract whereby the defendant agreed to employ the plaintiff to haul all gasoline used or sold by the defendant in the conduct of its business, and the plaintiff agreed to haul all gasoline required in the defendant's business at a certain price per gallon for a period of two years. The Court held the plaintiff was not entitled to recover for breach of contract because the defendant-company was dissolved during the two-year period and did not engage in business thereafter. The Court stated, 282 N.Y.S. at page 673, "I discover nothing in the contract from which any promise can be implied [to continue in business] or any requirements can be measured."

It distinguished the Wells case on the ground that, "In that case the requirements were substantially definite and the court held that the contract was as definitely stated as possible and the requirements could be definitely determined."

This case appears to support the view taken here. Professor Williston states in Williston on Sales, 2d Ed., Vol. II, Sec. 464, p. 1173 (referring to the construction given the agreements in the Wells case, supra): "This construction, however, does not seem the proper one in ordinary cases where the buyer agrees to take what he 'requires, needs, or wants.'"

The contract here is not similar in its provisions to those in such cases as Diamond Alkali Co. v. P. C. Tomson & Co., Inc., 3 Cir., 35 F.2d 117, and E. I. DuPont de Nemours Powder Co. v. Schlottman, 2 Cir., 218 F. 353, wherein it was held that it was unreasonable under the circumstances to close down business and they are not controlling. For other cases of this nature, see Williston on Contracts, Rev. Ed., Vol. I, p. 359, note 12.

It is my conclusion that there were no provisions in the present contract from which it could be implied that the buyer agreed to stay in business and have requirements and it did not breach its contract with Atwater when it discontinued its business in good faith.

In view of the conclusions reached herein, it is unnecessary to consider the defense of waiver interposed by the defendant.

Judgment for the defendant, with costs.