LOUDENBACK FERTILIZER CO. v. TENNESSEE PHOSPHATE CO.

(Circuit Court of Appeals, Sixth Circuit. March 13, 1903.)

No. 1,124.

1. CONTRACT—VALIDITY—MUTUALITY.

A contract by which a manufacturer of fertilizers agreed to buy its entire consumption of phosphate rock for five years from the other party at a fixed price, and the other party agreed to supply the same as ordered, it being further stipulated that the quantity used by the buyer was understood normally to amount to 1,500 tons yearly, but that it should have the right to demand as much as 3,000 tons, imposes upon both parties an obligation to perform, which constitutes a good consideration, and is not void for lack of mutuality.

2. SAME—BREACH.

Plaintiff, the purchaser under such contract, in the conduct of its factory treated the rock with sulphuric acid, and made what was called "acid phosphate," which it sold as a fertilizer, and also used as the base of a higher grade of fertilizer. For more than a year during the term of the contract it ordered no rock from defendant, but purchased the acid phosphate it used from other manufacturers, as more profitable. At the end of that time the price of rock having materially advanced, it ordered the maximum of 3,000 tons for the ensuing year under the contract. *Held*, that its substitution of acid phosphate for the rock previously used in its business, and contracted for, solely because more profitable, was a substantial breach of the contract.

3. SAME—RIGHT TO SUE FOR BREACH—PRIOR BREACH BY PLAINTIFF.

A party to a contract, who commits a substantial breach thereof, cannot maintain an action against the other party for a subsequent failure or refusal to perform.

4. SAME—ENTIRETY.

A contract by a manufacturing concern for the purchase of all of a certain material used in its factory for five years at a fixed price per ton, to be shipped on orders as required, is entire, and not divisible.

5. SAME—ACTION FOR BREACH—ESTOPPEL TO DENY LIABILITY.

A delay of a few days by one party to a contract before refusing a demand by the other party for further performance will not estop it to rely on a prior breach by the party making the demand, where it appears that it was not fully advised as to the action of the other party, and had no intention of waiving its rights.

In Error to the Circuit Court of the United States for the Middle District of Tennessee.

This is an action to recover damages for a breach of a contract. The plaintiff in error, hereafter styled the "plaintiff," is an Ohio corporation, engaged in making fertilizers at its factory in Ohio. The defendant in error, hereafter referred to as the "defendant," is a Tennessee corporation, engaged in mining phosphate rock at Attilla, Tenn. The plaintiff and defendant entered into a written contract, by which the defendant agreed to sell to the

¶ 1. Mutuality in contracts, see note to American Cotton Oil Co. v. Kirk, 15 C. C. A. 543.

¶ 3. See Contracts, vol. 11, Cent. Dig. § 1207.

plaintiff its entire "consumption of phosphate rock" for a term of five years beginning January 1, 1897, at a stipulated price per ton. This contract, among other things, provided:

(1) That the rock should be shipped as ordered by defendant.

(2) Shipments to commence as soon as 500 tons previously contracted for should be consumed, and thereafter the plaintiff agreed to buy its entire consumption from defendant.

(3) The plaintiff to have the right to demand as much as 3,000 tons annually. But the contract recited: "It is understood that your present annual consumption is estimated at something like 1,500 tons under normal conditions."

(4) Rock to be settled for on the 10th of each month for all rock received during the preceding month.

The breach alleged is that the defendant refused to comply with the orders of the plaintiff given between January 25, and July 10, 1899, for the shipment of rock aggregating 3,000 tons.

In lieu of a general averment that the plaintiff had not itself previously breached the agreement, the pleader sets forth the circumstances surrounding the making of the contract, and precisely what had been done by each party under the agreement. Thus it is averred that the plaintiff was engaged in making and selling two grades or qualities of fertilizer, one styled a "complete" and the other an "incomplete" fertilizer. The "incomplete fertilizer," otherwise called "acid phosphate" or "acidulated phosphate," is made by treating the crushed rock with sulphuric acid, and then grinding the dried mass into powder. The resulting product is called "acid phosphate," and is itself sold and used as a fertilizer; and the business of plaintiff at the time this agreement was made was in part the manufacture and sale of this grade of fertilizer. Plaintiff's factory was equipped for the manufacture of this acidulated phosphate, and plaintiff informed the defendant that it proposed to enlarge its facilities for making acid phosphate, and to increase its output of that product. It is also averred that this acidulated phosphate was the principal constituent in the making of a more complete fertilizer.

The declaration then avers that between August, 1897, and January, 1899, it did not order any phosphate rock from the defendant, nor did it buy any from any other producer. To explain this, it is averred that the makers of sulphuric acid so advanced the price by a combination as to make it cheaper for plaintiff to buy the acidulated phosphate, both to supply its customers for that grade of fertilizer and as the basis for the higher grade of fertilizers made and sold by it. The declaration proceeds as follows: "So that the plaintiff found it absolutely necessary for its economic life, and therefore it was, by these abnormal conditions, driven to cease the manufacture, temporarily, of acid phosphate, either for use in plaintiff's own factory of complete fertilizers, or for sale for use as a direct, though incomplete, fertilizer." It is then averred that in the latter part of 1898 the promise for a much larger demand for fertilizers, together with a great decline in the price of sulphuric acid and a rise in the price of crude rock, induced the plaintiff to enlarge its capacity for producing this acid phosphate, and for extending its sale, and to meet this increased capacity it ordered the maximum amount of crude rock admissible under the contract. It is then averred that plaintiff gave notice that it would be obliged to buy acid phosphate if defendant did not ship the crude rock as ordered, and would look to it for the difference between the price paid and the cost of manufacture, but that the defendant had refused to carry out its agreement, claiming that plaintiff had first breached the agreement by buying acid phosphate as aforesaid. It is further averred that plaintiff had bought about 3,000 tons of acidulated phosphate to supply its contracts for that product and to carry on its manufacture of the complete fertilizer. The defendant demurred. The demurrer was sustained by Judge Clark, and the plaintiff has sued out this writ of error.

Ernst, Cassatt & McDougall, F. C. Maury, and Thomas E. Matthews, for plaintiff in error.

George T. Hughes and William L. Granbery, for defendant in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after stating the above facts of the case, delivered the opinion of the court.

The only consideration upon which this contract rests is the mutual obligation to perform. It is not an agreement for the sale and purchase of a definite quantity of phosphate rock. But that is not fatal. If the agreement had been to supply to the plaintiff 1,500 tons of rock each year, no one would question the definiteness of the agreement. That amount was the estimated annual consumption of such rock by the plaintiff under ordinary conditions. But in a particular year it might be more or it might be less than this estimated average consumption. Now, in this situation the seller, in effect, says: "You say your usual consumption is 1,500 tons per year, but that the demand for the rock is dependent on the demand for fertilizers, and that the latter demand is dependent on agricultural conditions, which are variable; that one year you may need more than that amount, and another less. Very well, let us contract with regard to this. I, too, must know something about the amount I may be called upon to supply. We will fix a maximum on that side of 3,000 tons. You, on your part, instead of agreeing to take each year a definite number of tons, must agree to take all of your consumption of rock from me at the stipulated price, and I will agree to hold myself in readiness to furnish you all of your rock as you may order same. But you must take your entire supply from me, for, if you are to take it only as you choose to buy from me, you may choose to buy none if the price goes down and a great deal if the price goes up." Now, such a contract would not be unilateral. The plaintiff would be bound to take its entire supply from the defendant. The amount which is to be bought is made as definite as possible under the circumstances. The quantity is to be measured by the requirements of the factory in a business which necessarily requires a very large amount if it shall continue to be operated in the future as in the past. Though the quantity to be bought and sold was indefinite, it was ascertainable by the terms of the agreement, and therefore certain. "Certum est quod certum reddi potest." A contract to buy all that one shall require for one's own use in a particular manufacturing business is a very different thing from a promise to buy all that one may desire, or all that one may order. The promise to take all that one can consume would be broken by buying from another, and it is this obligation to take the entire supply of an established business which saves the mutual character of the promise. Manhattan Oil Co. v. Richardson Lubricating Co., 51 C. C. A. 553, 113 Fed. 923; National Furnace Co. v. Keystone Mfg. Co., 110 Ill. 427; Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Brawley v. U. S., 96 U. S. 168, 172, 24 L. Ed. 622; Staver Co. v. Park Steel Co., 43 C. C. A. 471, 104 Fed. 200; Smith v. Morse, 20 La. Ann. 220.

The contract, thus interpreted, is distinguishable from a class of cases where the agreement was held to be a mere option. Thus, in Railroad v. Dane, 43 N. Y. 240, an offer to receive and transport

railroad iron from New York to Chicago, not to exceed a certain number of tons, during a specified period, at a definite rate, was accepted without any agreement to deliver any iron for transportation. This contract was held not to be binding on either party for want of mutuality. In Petroleum Co. v. Coal, Coke & Mfg. Co., 89 Tenn. 381, 387, 18 S. W. 65, a lease was upon consideration that, if the lessee should "deem it advisable" to test for and work mines discovered thereon, he should pay a royalty upon the output. The lease was held void, the lessee not being required to make any test or operate any mine if discovered. In American Cotton Oil Co. v. Kirk, 15 C. C. A. 540, 68 Fed. 791, a contract to sell 10,000 barrels of oil at an agreed price, in such quantities per week as the buyer might desire, and to be paid for as delivered, was held void, because the buyer was held not to be under obligation to take or receive any particular quantity per week, or the whole in a definite number of weeks. In Crane v. Crane, 45 C. C. A. 96, 105 Fed. 869, a contract by a wholesale dealer to sell a retailer, during a certain time, at stated prices, so much lumber as the latter "should require for his trade," was held void for want of mutuality, as there was no approximation of what might be the trade of the retailer. If prices should go down, he would naturally make no sales at a price below what he was to pay; but, if prices went up, he would be in a situation to drive his rivals from business by increasing his trade at the expense of the vendor. In Davis v. Mining Co., 93 Mich. 491, 53 N. W. 625, 24 L. R. A. 357, a contract by which the plaintiffs agreed to work an ore bank for $1.50 per ton of ore produced "as long as we can make it pay" was held void for want of mutuality and definiteness of terms.

But how does the plaintiff interpret the agreement? For two years it bought no rock. The third year it demands the maximum quantity allowable under any conditions. It excuses itself for its failure to take any rock in 1897 and 1898 by, in effect, saying that "it was more profitable for me to stop making acid phosphate altogether, and to buy my supply of that product." "As I bought 'acid phosphate,' and did not buy the crude rock, I did not violate my agreement with you, for my factory was during that period consuming no crude rock whatever." But, as illustrating the inconsistency of this position, the plaintiff, when it became cheaper to make than to buy acidulated rock, notified the defendant that if it did not supply its demand for crude rock it would buy acidulated rock, and hold defendant liable for the difference between the price paid and what it would cost to make it; and the damages sued for in this case is the difference between the price paid for the acidulated rock and the cost of making same. If this result is possible, the operation of the contract is most unjust. The only "consumption" of phosphate rock by plaintiff's factory at the date of this contract was in the making of the lower form of fertilizer called "acid phosphate" or "acidulated phosphate." This product it made and sold as a fertilizer. It also used it as a base in making a higher grade of fertilizer. To justify the demand for 3,000 tons of crude rock in 1899—that being double the average or normal demand—the plaintiffs in this declara-

tion aver that when the contract was made they notified defendant that it expected to greatly increase its capacity for making and storing that kind of fertilizer.

Now, in the face of this character of operation conducted by its factory and the known normal "consumption" of rock in its factory, the plaintiff excuses its purchase of acid phosphate by, in effect, saying, "I found it more economical to buy acidulated phosphate than to make it, as I have been doing. This I did in good faith. That is, it was in fact more economical for me to buy than to make, and this good faith of mine justifies my conduct, and now, that it is more profitable to take the rock from you at the stipulated price, seeing that such rock has now doubled in price, and sulphuric acid gone down, than to buy the rock already acidulated, I now elect to resume the consumption of rock for the making of acidulated rock on as great a scale as my agreement with you will permit." Thus interpreted, the agreement is a mere option, and utterly void. Addison on Contracts, § 18; Crane v. Crane, 45 C. C. A. 96, 105 Fed. 869; Amer. Cotton Oil Co. v. Kirk, 15 C. C. A. 540, 68 Fed. 791; The Chicago & Great Eastern Railway Co. v. Dane, 43 N. Y. 240; Davie v. Mining Co., 93 Mich. 491, 53 N. W. 625, 24 L. R. A. 357; Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218.

The only consideration for the promise of the defendant to sell is the obligation of the plaintiff to take its entire consumption of rock, and if the plaintiff is in fact at liberty to carry on its business by buying its acidulated rock when its price was less than the cost of making it, and thereby avoiding any actual consumption of crude rock, the contract is one which it may perform or not, as it pleases. "The mutuality of the obligation is the very essence of all contracts founded upon mutual promises. Hence it follows, observes Pothier, that nothing can be more contradictory to such an obligation than an entire liberty in either of the parties making the promise to perform it or not, as he may please. An agreement giving such liberty would be absolutely void for want of obligation." Addison on Contracts, § 18. But we do not accept the plaintiff's interpretation of the agreement as correct. From all the surrounding circumstances it was intended to make the amount of rock which the plaintiff was bound to take as definite as possible by the statement of the average or normal consumption in the manner in which the factory was operated and by the agreement to take the entire consumption for a definite time at a stipulated price. Undoubtedly, there is a margin of allowance to be made for the contraction or expansion of the business incident to the varying conditions to which it is ordinarily subject. These conditions may be said to be within the contemplation of the parties when, instead of contracting for a definite amount, deliverable each year, the contract was made for "all of the consumption" of the rock during a definite period of time. This contract gave the plaintiff liberty to use more or less, so long as it did not reduce or increase its consumption beyond the requirements of the usual fluctuations incident to the character of manufacturing carried on by it. This diminution or increase according to the reasonable fluctuations of such a business, if the result of the carrying on of the

business with good faith in view of the obligations of the plaintiff to the defendant, constitutes the limit of the liberty allowed by the contract, and it is only in this respect that the question of good faith has any bearing upon the rights of the parties under the agreement.

Any interpretation of the agreement which will enlarge the discretion of the plaintiff so as to allow him to desist from carrying on the business substantially as it was carried on when the agreement was made by permitting it to substitute purchased acid phosphate for that of its own make, simply because it could temporarily be bought more cheaply than it could be made, would place the defendant at the mercy of the plaintiff, and convert the agreement into a mere option. The contract must be read in the light of the fact that the principal business of the plaintiff was to make "acidulated" phosphate" both for sale and for mixing in combination with other chemicals to make another grade of fertilizer. The defendant had the right to believe that the plaintiff's purpose was to continue the making of acid phosphate and that the rock consumed in that business was to be all taken from it. To say that the plaintiff was at liberty to desist entirely from making acidulated phosphate whenever it could buy the product to meet the demands of its business cheaper than it could make it, and was only bound to take rock when it could make that grade of product cheaper than it could buy it, is in opposition to the plain meaning of the agreement, as well as destructive of the mutuality of the contract.

In Crane v. Crane, 45 C. C. A. 96, 105 Fed. 869, the contract was by a wholesale dealer in lumber to supply a retailer during a certain time, and at a stipulated price, with so much of a certain grade of lumber as the purchaser "should require for his trade." This contract was held void for want of mutuality, inasmuch as it left it practically optional with the purchaser to increase or diminish his orders with the rise or fall in price. The opinion of the court was by Grosscup, Circuit Judge, who, after referring to such cases as National Furnace Co. v. Keystone Mfg. Co., 110 Ill. 427, and Smith v. Morse, 20 La. Ann. 220, and Railway Co. v. Witham, L. R. 9 C. P. 16, said:

"In all these cases contracts looking towards the future, and embodying subject-matter necessarily indefinite in quantity, have been upheld; but it will be observed that, although the quantity under contract is not measured by any certain standard, it is capable of an approximately accurate forecast. The capacity of the furnace, the needs of the railroad, or the requirements of the hotel are, within certain limits, ascertainable by the vendor. He is thus enabled to make reasonably accurate calculation of the extent of his obligation. Then, too, the purchase is only an incident of the vendee's business. Presumably, the business will go on irrespective of a rise or fall in the prices of subsidiary supplies. There thus remains to the vendee little or no temptation, on account of the rise or fall in prices, to greatly enlarge or diminish the quantity of his orders."

In Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218, the contract was to furnish all the steamers of the defendant's line with coal for a definite time at a stipulated price. These steamers were at the time making regular trips between certain ports. Coal was delivered as needed for a part of the time, when defend-

ants sold and ceased to operate their steamers, and declined to receive coal thereafter, although the purchaser of the steamers continued to operate them as before. The contract was construed as one to furnish all of the coal which should be required to operate the steamers during the period covered by the agreement, and that the sale of the steamers did not operate to relieve the defendants from the obligation to take the coal "which the ordinary and accustomed use of the steamers required."

The plaintiff in error has cited and greatly relied upon the case of McKeever & Co. v. Cannonsburg Iron Co., 138 Pa. 184, 16 Atl. 97, 20 Atl. 938. The agreement involved there was to supply an iron mill "with all of the coal you will require for your mill for three years." The prices fixed were for three grades of coal—"forked coal," "run of mines," and "slack." The mill, pending this agreement, introduced natural gas, a fuel unknown when the agreement was made, which greatly reduced the quantity of coal required. It also bought a grade of coal called "nut" from another person, and claimed that they were liable only for the coal of the kinds specified actually required after the consumption of gas was begun. It was held that the mill was at liberty to diminish the use of coal as fuel by the introduction of gas, but that, as it appeared the "nut" coal took the place of "slack," it had no right to use it without liability to the plaintiffs. The case differs in its principal point on the facts and circumstances from the one at bar, though in the minor question —the right to substitute one grade of coal for another—it quite resembles the present case, and supports the conclusion we have reached. The opinion is, however, entitled only to that weight which attaches to a judgment of the Pennsylvania Supreme Court, for it is not supported by either argument or authority.

2. The plaintiff, by the facts stated on the face of the declaration, shows that it committed the first substantial breach of the contract. Having desisted from receiving phosphate rock for a period of nearly two years, because it found it more profitable to buy than to make acidulated phosphate, it now demands damages from the defendant because it had to buy acidulated phosphate at a loss in consequence of the refusal of the defendant to supply it with phosphate rock after it became more profitable to make than to buy that grade of fertilizer. If there is anything well settled it is that the party who commits the first breach of the contract cannot maintain an action against the other for a subsequent failure to perform. The plaintiff has not kept the contract, and shows no excuse for its breach. It does not, therefore, show any such performance on its own part as to entitle it to demand that the defendant shall go on and perform, or pay damages for a subsequent refusal to recognize the contract as in force.

3. The contract was clearly an entire contract. It was for the sale of all the phosphate rock which should be needed for the ordinary requirements of the plaintiff's factory, and was not a number of single contracts for the sale and delivery of definite quantities as ordered from time to time. . The breach went to the whole of the consideration. Cherry Valley Iron Works v. Florence Iron River Co., 64 Fed. 569, 12 C. C. A. 306; Monarch Cycle Co. v. Royer Wheel Co., 44 C. C. A.

523, 105 Fed. 324; Norrington v. Wright, 115 U. S. 213, 6 Sup. Ct. 12, 29 L. Ed. 366; Cattle Co. v. Martindale, 11 C. C. A. 35, 63 Fed. 84; Cleveland Rolling Mill v. Rhodes, 121 U. S. 255, 7 Sup. Ct. 882, 30 L. Ed. 920. We find no settled line of decisions in either Tennessee or Ohio in conflict with the decisions cited. So, whether the contract be a Tennessee or Ohio contract, and be governed by the law of the one state or the other, the result is the same, viz., the contract was entire, and not divisible. The Tennessee statute (section 4620, Shannon's Code) has no application, as it does not determine whether a particular contract is entire or divisible. It only provides that successive actions may be brought for successive breaches of a contract "when ever, after the former action, a new cause of action arises therefrom."

4. The right of the defendant to bring an action for the breach of the agreement is not before us. If it were, we would have to deal with the question as to how far it would be essential to aver and show a readiness on its own part to comply.

5. It is next contended that the defendant company "waived its right to rescind," and "is estopped to deny liability," because it did not refuse performance until after the plaintiff had filed its orders for 3,000 tons of rock between January 25 and July 25, 1899. There is nothing in this in any view of the case. The failure of the plaintiff to order shipments of rock for nearly two years naturally induced the defendant to suppose the agreement abandoned. Hence, when plaintiff began to give orders again, the defendant was unable to comply, having made no preparation to carry out the contract. But under date of February 17th the defendant declined to ship rock, and denied liability for the difference between cost of acid phosphate rock in the market and its cost made from rock under the contract. Under date of March 30th, defendant inquired upon what the mill of defendants had been run during its long period of inactivity in sending orders for rock. Plaintiff's correspondence is disingenuous in this matter. It waited until May 13, 1899, before answering, and then gave no information, referring the defendant to its statement in some earlier letter that "we had complied with the terms of our contract with you in every respect," and making no other explanation of its own breach. Instead it rapidly rushed in its orders, so that within a very short period it ordered 3,000 tons of rock, although its declaration avers that for the previous years its consumption of phosphate rock would not have exceeded 750 tons per year if it had bought the crude rock and made its own acid phosphate. No intention to waive is shown, and no such full knowledge of the facts as would justify us in saying that it was bound even if the fact of waiver was made out. There are other answers to this in view of the pleadings and the attitude of the parties. But it is enough to say that no intent to waive is shown by the facts appearing in the declaration.

The demurrer was properly sustained, and the judgment is affirmed.