## DIAMOND ALKALI CO. v. P. C. TOMSON & CO., Inc.

Circuit Court of Appeals, Third Circuit.
October 3, 1929.

No. 3834.

Wm. Clarke Mason and John Russell, Jr., both of Philadelphia, Pa. (Morgan, Lewis & Bockius, of Philadelphia, Pa., of counsel), for appellant.

John A. Brown and Theo. F. Jenkins, both of Philadelphia, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an appeal from a decree of the District Court dismissing the bill of complaint for want of equity.

The plaintiff-appellant is a manufacturer of soda ash, caustic soda, bicarbonate, and washing soda. These were used by the defendant, whose factory was at Philadelphia. The plaintiff's factory was at Fairport, Ohio. The parties thought that it would be to their mutual advantage if the defendant discontinued the operation of its plant in Philadelphia, and erected one near the plaintiff's factory at Fairport, and purchased the materials which it needed from the plaintiff. Accordingly, on November 25, 1925, they entered into a contract wherein it was provided, among other things, that:

(1) The plaintiff was to loan to defendant the aggregate amount of $100,000, in the sums of $10,000, at such times as the defendant notified plaintiff that the money was needed. The defendant was to give its promissory notes to the plaintiff as and when it received the money. These notes were to be payable each six months after the other.

(2) Plaintiff was to sell a certain piece of land at Fairport for $15,000 to defendant on which it was to erect "at once or as soon as practicable, a plant for the preparation and packing of lye, baking soda and washing and cleansing soda preparations. Said plant shall be of such size as to be capable of taking care at the present time of the entire business of the Tomson Company in the preparation of packing of lye, baking soda and washing and cleansing soda preparations —and to cost, including cost of land purchased, not less than One hundred thousand Dollars."

(3) Plaintiff agreed to manufacture and sell and defendant to purchase "the entire requirements of the Tomson Company of soda ash, caustic soda, bicarbonate of soda, according to the terms and conditions in said agreement (attached to the contract specifying grades of material, manner of packing, times of payment, etc.), which agreement shall continue for a period of five years from January 1, 1926."

(4) The defendant was not to mortgage or pledge its assets without the consent of the plaintiff during the continuance of the agreement.

(5) Defendant was "not to sell, lease or enter into any contract for the operation of its manufacturing plant at Fairport without the consent of the Alkali Company during the continuance of this agreement."

(6) In the event of the insolvency of the defendant, all the notes given for the payment of the $100,000 and not paid were to become due and payable.

In accordance with the terms of this contract, defendant purchased the land at Fairport from the plaintiff and erected a plant on it. During this period of about one year and a half, the plant at Philadelphia was operated, and the plaintiff furnished the defendant its "requirements" of materials used. At the end of this period, and before its plant was moved to Ohio, the defendant sold its Philadelphia plant, including good will, to the Ford Company, and agreed not to enter into business again for five years.

After the defendant had sold and transferred the assets in its Philadelphia property to the Ford Company, it refused to open and operate its plant at Fairport, Ohio, and to purchase any material from plaintiff, although plaintiff had enlarged its plant and increased its facilities in order to carry out its contract to furnish the defendant's "entire requirements of each of the materials in its business of preparing, packing and selling lye, baking soda and washing and cleansing preparations, whether at its plant at Fairport, Ohio, or elsewhere during the period of five years beginning January 1, 1926."

Thereupon the plaintiff filed its bill against the defendant, wherein it prayed: (1) That the defendant be restrained from delivering its property to the Ford Company; (2) that it be required to cancel the contract with the Ford Company; (3) that if any of its assets had been delivered to the Ford Company, the defendant be required to return the consideration and recover the assets; (4) that defendant be restrained from disposing of its assets; and (5) that the plaintiff might have other and further relief.

The case was tried to the court, which dismissed the bill for want of equity.

■ The real question is whether or not under the terms of this contract there was an obligation on the part of the defendant to continue in business for five years and buy its supplies from the plaintiff during this time. The learned District Judge found that there was no such obligation, and, if he was right in this conclusion, that ends this case, and the decree should be affirmed.

There is admittedly no express provision specifically stating in precise terms that the defendant will continue in business and buy its supplies from the plaintiff for five years. The question then arises as to whether or not such a provision is necessarily implied from the express provisions which the contract does contain. As the district judge said: "The doctrine of implied contracts is built upon the finding that, if the parties had expressed what was in mind to be done or not done, they would have expressed what is sought to be implied." He further said: "That there may be an agreement in which an undertaking not express is imputed to a party because of other undertakings, which are expressed, is undoubted. Many illustrations of this can be found in the decided cases. The instant case is, however, not of this type. In an agreement which on its face purports to express all the things which a party agrees to do, there is no room left to interpolate another agreement, not expressed. In illustration, there is the agreement here that the defendant shall neither mortgage nor in any manner pledge its assets without the consent of the plaintiff. Why was not a sale included, if contemplated?" The learned judge based this statement and question on the seventh paragraph of the contract, but the ninth paragraph shows that a sale was contemplated, at least at Fairport, and was expressly included in the following language:

"Ninth.—That Tomson Company agrees not to sell, lease or enter into any contract for the operation of its manufacturing plant at Fairport without the consent of the Alkali Company during the continuance of this agreement."

The seventh and ninth paragraphs should be read together. It was the intention of the parties that the entire manufacturing establishment of the defendant should be removed from Philadelphia to Fairport as soon as practicable. In the seventh paragraph it was intended so to provide against any prevention of the removal by a mortgage or pledges of assets at Philadelphia, and in the ninth paragraph it was intended both to prevent a sale or other disposition of the manufacturing plant, after removal, at Fairport, and to guarantee its operation for five years after the removal there.

The $100,000 to be loaned to the defendant by the plaintiff was to be used by the defendant in the erection of a plant at Fairport. The notes were to be paid each six months after the other. There were ten of these notes, and the last was payable five years after the date thereof. This fact seems

to indicate that it was anticipated, intended, or implied that the operating contract between them was to continue for at least five years during which these notes were running and being paid off.

The plant was to be large enough "to be capable of taking care at the present time of the entire business of the Tomson Company in the preparation of packing of lye, baking soda and washing and cleansing soda preparations—and to cost, including cost of land not less than one hundred thousand dollars."

In the sixth paragraph of the contract, as above indicated, the plaintiff agreed to manufacture and sell, and the defendant to purchase, "the entire requirements of the Tomson Company of soda ash, caustic soda, bicarbonate of soda and washing soda, according to the terms and conditions specified in said agreement (attached to the contract specifying grades of material, manner of packing, time of payment, etc.) which agreement shall continue for the period of five years from January 1, 1926." That portion of the agreement to which reference was made provides:

That the defendant would purchase its "entire requirements of each of the materials in its business of preparing, packing and selling lye, baking soda and washing and cleansing preparations, whether at its plant at Fairport, Ohio, or elsewhere, during the period of five years beginning January 1, 1926, and ending on December 31, 1930; if shipped elsewhere additional freight charges for account of Buyer."

"At least thirty days before the first day of each calendar month of the term of this contract, Buyer shall give Seller written notice, specifying in detail its actual requirements of each of the materials for such calendar month and specifying as regards such materials (in the event that one or more grades of such materials or one or more manners of packing are hereinbefore provided for) the grade or grades thereof, the quantity of each grade, and the manner of delivery desired by Buyer."

Was it intended and implied by the parties that the defendant would continue in business and operate for five years? There was a period during which it was understood that "the term of this contract" was to run. There is no intimation that "the term" was to be other than the five years mentioned. It erected a building at Fairport at a cost of $196,477.46. Mr. Martin E. Brigham, president of the defendant testified that: "We certainly would not have bought that ground to put that building on it if we did not have intentions of transferring our manufacturing plant there." He explained the reason for fixing a five-year period for the existence of the contract as follows:

"I think the reason for fixing a period of five years during which the Diamond Alkali Company would furnish us with our requirements, was that if we only made a yearly agreement, we would invest in a factory there, and have several hundred thousand dollars invested in it, and if anything should happen, we couldn't get our raw material, why, there would be no advantage to it. I think that was one of the reasons for it. We wanted to be sure of the supply for our manufacturing during the period of five years operating our new building."

Relying upon the continuance of the contract for a period of five years, the plaintiff enlarged its plant to take care of the new contract. Mr. Gundelfinger, vice president of the plaintiff company, said:

"We enlarged the capacity of our works on account of this contract.

"As a result of the contract with P. C. Tomson Company we lost opportunities for business with other manufacturers of lye, with one of the large lye packers. They said that we were in partners with the Tomson Company and asked why they should buy their caustic soda from us. We enlarged our plant after the making of the contract with P. C. Tomson Company to take care of the requirements of their business during the five years of the contract. That was after the contract with P. C. Tomson & Company was made."

The defendant was to purchase its entire requirements of the plaintiff for a "period of five years from January 1, 1926." All the negotiations between the parties, the entire contract with all its covenants and the entire enterprise of the parties were based upon the proposed "continuance" of the contract for "the term" of five years. The fulfillment of their undertakings necessarily implied such a continuance. The parties in good faith contemplated performance of the covenants requiring the defendant to purchase all its specified supplies from the plaintiff for five years and implicit in these negotiations and stipulations was the bona fide operation by the defendant of its manufacturing plant at Fairport for that period. The defendant did not intend to do otherwise until an unexpected opportunity to make "an advantageous sale" presented itself.

Whenever a contract cannot be carried out in the way it was obviously expected that it would be carried out without one par-

ty or the other performing some act not expressly promised by him, a promise to do that act must be implied. 3 Williston on Contracts, p. 2341; E. I. Du Pont, etc., Co. v. Schlottman (C. C. A.) 218 F. 353; Great Lakes & St. Lawrence Transportation Co. v. Scranton Coal Co. (C. C. A.) 239 F. 603. The fact that the contract did not in express terms say that the defendant would continue in business for five years did not relieve it from performing their mutual intention as indicated by the express covenants, and in order to do so, it had to continue in business. Great Lakes & St. Lawrence Transportation Co. v. Scranton Coal Co., supra; Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Hickey v. O'Brien, 123 Mich. 611, 82 N. W. 241, 49 L. R. A. 594, 81 Am. St. Rep. 227; Loudenback Fertilizer Co. v. Tennessee Phosphate Co. (C. C. A.) 121 F. 298, 61 L. R. A. 402.

When the defendant sold, not the Philadelphia real estate, but the manufacturing assets and good will coupled with an express agreement not to engage in business for five years, it put itself in a position in which it could not carry out its contract with the plaintiff, and so breached it.

The defendant cannot be restrained from delivering the property to the Ford Company, for they have already been delivered. Neither can the defendant cancel the contract with the Ford Company, for it has been fully performed. If the defendant were to return the consideration and demand the return of the assets, the Ford Company could and probably would decline to give them up, and this court would be powerless to compel it to do so.

The plaintiff is entitled to damages for the breach, but it cannot get them in a court of equity. The case should have been transferred to the law side of the court so that a jury could have passed upon the question of damages. However, no motion was made by the plaintiff for such transfer, and the learned District Judge did not transfer it of his own motion.

Equity rule No. 22 provides that: "If at any time it appear that a suit commenced in equity should have been brought as an action on the law side of the court, it shall be forthwith transferred to the law side and be there proceeded with, with only such alteration in the pleadings as shall be essential."

Therefore the decree of the District Court is reversed, with directions to transfer the case to the law side of the court to be there proceeded with according to law.