**CENTRAL STATES POWER & LIGHT CORPORATION v. UNITED STATES ZINC CO.**

No. 519.

Circuit Court of Appeals, Tenth Circuit.

Aug. 1, 1932.

McDERMOTT, Circuit Judge, dissenting.

Elmer J. Lundy, of Tulsa, Okl. (L. M. Poe, R. E. Morgan, and Poe, Lundy & Morgan, all of Tulsa, Okl., and Francis E. Matthews, and J. R. Harmon, both of Chicago, Ill., on the brief), for appellant.

Shell Bassett, of Tulsa, Okl., for appellee.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

COTTERAL, Circuit Judge.

The Central States Power & Light Corporation brought this action to recover damages of the United States Zinc Company for breach of a contract between S. M. Williams, Jr., and the defendant, dated June 30, 1927, whereby the zinc company was to take and pay him for gas to be used in operation of its smelter at Henryetta, Okl., from October 25, 1927 to October 25, 1930. The contract was in terms binding on the assigns and successors of the parties. The plaintiff acquired the rights of Williams. The issues were framed upon an amended petition, answer, and reply, the cause was tried to a jury, and a verdict was returned for the defendant.

It is assigned as error that the court overruled motions to strike portions of the answer which set up as defenses the oral understanding defendant claimed to have had with Williams that the contract was not to obligate defendant if it discontinued the smelter; that the court treating the contract as ambiguous allowed evidence in support of that defense; that the court charged the jury to consider that evidence and denied plaintiff's request for a peremptory instruction.

The controversy is whether that defense was permissible under the terms of the contract. It designated Williams as vendor and the defendant as vendee. By section 1, the vendor agreed to sell, furnish, and deliver gas to vendee, at $7\frac{1}{2}$ cents per thousand cubic feet, to the limit of vendor's capacity, but not more than a minimum later specified. Section 2 is as follows: "Vendee agrees to receive, purchase and pay for said gas at said price and on the basis above stated, and to take during the first year of the contract at least two million cubic feet of gas per day, and during the second and third years of the contract at least three million cubic feet of gas per day; provided, that, if the total requirements of vendee for gas fuel does not equal or exceed the two or three million per day that vendee shall be required to take only the amount of its total requirements."

Section 5 required the vendor to install and maintain on vendee's premises during the life of the contract all necessary meters, regulators, and equipment. Section 6 provided

the contract was to remain in full force and effect for three years from the time the gas was first furnished. By section 7 the vendor was not to be responsible for failure to furnish gas occasioned by breaks in the pipe line, strikes, acts of God, or other unavoidable casualty; and it was understood vendor was to construct a pipe line for transporting the gas to the smelter, that the defendant required a continuous gas supply, and, if vendor's supply should not be delivered continually and for that reason vendee could not operate the smelter continuously and should be compelled to make arrangement for other gas for any part of the minimum, except for reasons stated in paragraph 7, then vendee should not be obligated to take the minimum, as specified in paragraph 2, but might take such amount which, taken with its other supply, should be necessary to operate the smelter.

It was shown at the trial the smelter of defendant was operated since 1916, and that defendant took and paid for the gas under the contract with plaintiff only up to June 1, 1928, when it dismantled and discontinued operation of its plant, and refused to take gas from the plaintiff. There was evidence of other related facts, such as an effort to obtain a reduced rate of the gas, notice discontinuing the purchase of gas, the unprofitable operation of the smelter, etc. The plaintiff showed its outlays made to obtain the gas and to install a pipe line to transmit and furnish the gas and its offer to supply the gas according to the contract. These matters were not questioned.

Certain testimony was received over objection by the plaintiff. F. P. Lannon, defendant's manager, testified to conversations with Williams prior to the execution of the contract. He told Williams the defendant would not sign a contract requiring it to take the gas if the plant should be curtailed, or in case of strike, war, interruption of railroads, etc. Lannon stated that at Williams' request he furnished a letter that he would sign the contract. Williams prepared and presented the contract. Lannon said he told Williams he had written him defendant would not pay for any gas if the plant was curtailed or closed down. Williams said he had taken care of that, read the proviso of section 2 to Lannon, and added, "if you take less than the two or three million you will only pay for what you take and if you close down and don't take any gas you don't pay for any"; that was distinctly understood; and Lannon said, "All right," and approved the contract and recom-

mended it. The contract was then furnished to the companies for execution.

In another prior conversation Lannon told Williams he did not know any reason for shutting down the plant, and, in substance, it might occur and had occurred, and he felt reasonably sure of operation but would not guarantee it. Further testimony given by Lannon and Newhouse, vice president of the defendant, was to the effect that in May, 1928, a conversation took place with Poe, plaintiff's division manager, in which Newhouse asked a release of the defendant as its plant would be closed in June or the last of May, and Poe replied that, if defendant stopped using gas, the contract would be automatically canceled.

Counsel for appellant first invoke the rule which is firmly settled by authority, that parol evidence is inadmissible to contradict or modify a written contract, and it is conclusively presumed the whole engagement of the parties is expressed therein. Green v. Chicago & N. W. Railway Company (C. C. A.) 92 F. 873; McMaster v. New York Life Insurance Co. (C. C. A.) 99 F. 856; Potomac Steam-Boat Co. v. Upper Potomac Steam-Boat Co., 109 U. S. 672, 3 S. Ct. 445, 27 L. Ed. 1070. Section 5035, Comp. Okl. Stat. 1921, provides that the execution of a contract in writing supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument. This section applies to the contract in question, as its obligations were to be performed in Oklahoma. Brown v. Ford Motor Company (C. C. A. 10) 48 F.(2d) 732.

The defendant's contention was and is that there was ambiguity in the contract, due to the proviso in section 2, and for that reason it was competent to plead and prove the oral understanding of the parties to the effect that in case the smelter should be discontinued, the defendant's requirement of gas and its liability therefor were at an end.

We are unable to agree with this view of the contract. It contained an absolute provision it was to be in full force and effect for three years, and the quantity of gas to be taken and the price to be paid therefor were specified. The proviso in section 2 merely conformed defendant's obligation to its total requirements. In that respect it seems to us this language is unambiguous. It certainly cannot be construed, as defendant claims, to mean that, if the smelter should be closed or discontinued, there would be no further lia-

bility on the contract. The language used was therefore equivalent to an ordinary agreement to purchase a commodity required in a given business.

In the interpretation of a contract, the cardinal rule is that the intention of the parties is to be ascertained. But when a contract is explicit in terms, it furnishes a complete guide for ascertaining that intention. Continental Oil Co. v. Fisher Oil Company (C. C. A. 10) 55 F.(2d) 14.

The contract was entirely valid because of the mutual considerations of the parties. It bound the plaintiff to furnish the gas at a stipulated price for a definite period, and it bound the defendant to take and pay for the gas up to the requirements of the smelter as an operating plant. The authorities are uniform in holding such a contract to be mutual and binding, as the consideration to be rendered by the defendant is certain or reducible to certainty. The defendant owning an established business had the implied obligation to continue it in the usual manner, and accept during the time fixed the gas required to so conduct it. Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Cold Blast Transportation Co. v. Kansas City Bolt & Nut Company (C. C. A.) 114 F. 77, 57 L. R. A. 696; Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283, 62 N. E. 367; Hickey v. O'Brien, 123 Mich. 611, 82 N. W. 241, 49 L. R. A. 594, 81 Am. St. Rep. 227; Loudenback Fertilizer Company v. Tennessee Phosphate Company (C. C. A.) 121 F. 298, 61 L. R. A. 402; Lima Locomotive & Machine Company v. National Steel Castings Co. (C. C. A.) 155 F. 77, 11 L. R. A. (N. S.) 713; E. I. DuPont de Nemours Powder Company v. Schlottman (C. C. A.) 218 F. 353; Great Lakes & St. Lawrence Transp. Company v. Scranton Coal Company (C. C. A.) 239 F. 603; Texas Company v. Pensacola Maritime Corporation (C. C. A.) 279 F. 19, 24 A. L. R. 1336; Kamm v. Pritchard (C. C. A.) 296 F. 871; Diamond Alkali Company v. P. C. Tomson & Company (C. C. A.) 35 F.(2d) 117; Griffin v. Oklahoma Natural Gas Corporation (C. C. A.) 37 F.(2d) 545.

It is true, as counsel for the defendant claims, that the circumstances under which parties enter into a contract may be considered as well as the language used in order that the court may view the subject-matter from the standpoint of the parties. Great Lakes & St. Lawrence Transp. Company v. Scranton Coal Company (C. C. A.) 239 F. 603; Newport News Ship Building & Dry Dock Company v. United States (C. C. A.) 34 F.

(2d) 100. But this furnishes no aid to the defendant. Its contentions come to this: That it was agreed defendant might quit operating the smelter and end liability; in other words, the plaintiff was to go to great expense in preparation to deliver the gas, but the defendant was not obligated to take it for any definite time, with the result that, if defendant could be rid of the obligation at the end of the period of operation, it could likewise avoid it in one month or one day. Surely this would be a most unreasonable interpretation of the contract. And it overlooked the stipulation to take the gas for a certain period; also the expression in the contract of "requirements" instead of desire or will on the part of the defendant.

The case differs from the usual instance of an agreement where the vendor is to furnish all of a commodity required by vendee. There were certain limitations on both sides. The plaintiff was not to furnish more than two or three million cubic feet of gas per day, and the defendant was not bound to take beyond its requirements. But the elements of certainty furnish the test of the mutual consideration. Limiting the obligation definitely on each side does not render it insufficient. An undertaking is valid where it is to take all the needs of a business within quantities stated. Texas Company v. Pensacola Maritime Corporation (C. C. A.) 279 F. 19, 24 A. L. R. 1336; Mexican Petroleum Corporation v. North German Lloyd (D. C.) 17 F.(2d) 113. The rule as announced in this circuit is that a contract to furnish an ascertainable quantity of gas is valid. Griffin v. Oklahoma Natural Gas Corporation (C. C. A.) 37 F. (2d) 545.

The District Court committed manifest error, therefore, in not striking those parts of the answer referred to which pleaded as defensive matter the oral understanding and conversations which preceded or followed the execution of the contract and in not excluding them at the trial. It was error also to charge the jury, as was done in this case, it might consider such defensive matters in ascertaining the terms on which the parties agreed in framing the contract, and if they were found as defendant claims a verdict was justified in its favor, and not to charge the jury the plaintiff was entitled to recover its damages for breach of the contract by the defendant.

The judgment is therefore reversed, and the case is remanded to the District Court, with direction to vacate the orders overruling plaintiff's motions to strike said defensive averments in the answer and to sustain those

motions, to grant a new trial of the cause, and otherwise proceed consistently with the views expressed in this opinion.

Reversed.

LEWIS, Circuit Judge (concurring).

I call attention to these facts: Appellee's plant at Henryetta had been in operation for about fifteen years and was using between three and four million cubic feet of gas a day when the contract sued on was entered into. Appellant began to deliver gas to the plant under the contract on October 25, 1927, and up to early in June in the following year, when appellee dismantled its plant after failing to induce appellant to reduce the contract price of gas, the average amount delivered per day by appellant was approximately six and one-half million cubic feet; from which it appears that the capacity of the plant and appellee's reasonable needs for fuel gas in its operation was far in excess of the two or three million cubic feet per day.

The basis of damages claimed by appellant was the refusal of appellee to further take and pay for the two or three million cubic feet per day at the contract price for the remainder of the three years. The seventh paragraph of the contract required appellant to deliver gas continuously in order that appellee might operate its smelter economically, and the first paragraph bound appellant "to sell, furnish and deliver gas to vendee to the limit of vendor's capacity; at a price of seven and one-half cents (7½c) per thousand cubic feet, * * * providing, however, vendor shall not be required to furnish more gas than the minimum agreed to be purchased, as hereafter specified." So far there is no uncertainty in the meaning of the language used in the contract. Appellant was to furnish and deliver gas continuously during the contract term of three years to the limit of its capacity at the price named, but it could not be required to furnish more than the minimum agreed to be purchased by appellee. The word "required" impresses me as important as well as the phrase "the minimum agreed to be purchased," when we come to consider the meaning of the second paragraph of the contract. Inasmuch as the vendor was bound to sell, furnish and deliver gas to the vendee to the limit of vendor's capacity, appellant might have been in a position to lawfully demand that appellee receive and pay for more than the minimum later specified in the contract, at such times as it was able to furnish the excess, notwithstanding the first paragraph said that the vendor could not be

"required" to do so, and therefore the second paragraph was intended as a protection to the vendee in that respect. This is the second paragraph of the contract:

"Vendee agrees to receive, purchase, and pay for said gas at said price and on the basis above stated, and to take during the first year of the contract, at least two million cubic feet of gas per day, and during the second and third years of the contract, at least three million cubic feet of gas per day, provided that, if the total requirements of vendee for gas fuel does not equal or exceed the two or three million per day that vendee shall be required to take only the amount of its total requirements."

We therein find "the minimum agreed to be purchased" by vendee, and down to the proviso in that paragraph nothing that is said would protect the vendee from a demand of the vendor that the vendee take gas in excess of that amount, as pointed out above under paragraph one of the contract. Seemingly the proviso to paragraph two was intended to give that protection, and I am constrained to believe that it was not its purpose to relieve the vendee from taking "during the first year of the contract, at least two million cubic feet of gas per day, and during the second and third years of the contract, at least three million cubic feet of gas per day," but it could not be "required" to take in excess of what it agreed to purchase, notwithstanding the provisions of paragraph one. It therefore seems to me that this is not a requirement contract, for had that been the purpose of the parties it would have been a simple matter to have so stated (that the parties agree that the vendor will sell and deliver to the vendee for a term of three years all of the gas that vendee may require in the operation of its smelter at Henryetta, and the vendee will take and pay for the same at 7½c per thousand cubic feet). The vendee knew, and doubtless the vendor also, that the requirements of the plant were in excess of "the minimum agreed to be purchased." The first paragraph relieved the vendor from a demand by the vendee that it furnish more than the minimum, and the second paragraph was intended to relieve the vendee from a demand by the vendor that the vendee take more gas than the minimum, although the vendor had bound itself to furnish to the limit of its capacity; but it left open to furnish and receive by mutual consent more than the two or three million feet at the agreed price. This is what the parties actually did during the first seven months in executing the contract,

and that is a proper guide to the construction of a contract. This suit, as already said, is to recover damages because of vendee's refusal to take the minimum that it had agreed to purchase, the two or three million cubic feet per day for the full three years, and inasmuch as the proof conclusively shows that the reasonable requirements of the vendee during the remainder of the contract would have been in excess of the amounts of gas so agreed to be purchased, the vendee could not relieve itself of liability by ceasing to operate its plant and voluntarily dismantling it.

McDERMOTT, Circuit Judge (dissenting).

It is agreed that appellee's smelter was not operated during the period for which recovery is sought. It neither used nor required any gas during that period. Appellee's obligation to purchase was limited by the requirements of its smelter. There is no express obligation in the contract to operate the smelter during the three-year period of the contract, or to pay for gas not required. Can such an obligation be fairly implied? I do not think so, and am therefore compelled to dissent.

The contract recites that vendee desires to purchase gas for its Henryetta smelter. The principal obligations of the parties under the contract may be analyzed as follows:

The vendor agrees: To deliver gas to the limit of its capacity, with these reservations: (a) It shall not be required to furnish more than the minimum agreed to be purchased (two or three million cubic feet per day); (b) it shall not be responsible for unavoidable casualties.

The vendee agrees: To take and pay for gas to the limit of vendor's capacity, with these reservations: (a) To take at least two million cubic feet per day the first year, and three million cubic feet during the second and third years; and (b) that if its total requirements for gas fuel does not equal or exceed the two or three million, it "shall be required to take only the amount of its total requirements."

The contract was to remain in force for three years, and it was agreed that if vendor's supply did not enable vendee to operate its smelter continuously, then vendee might buy elsewhere and be relieved of its obligation to take the minimum.

This is an agreement to buy and sell a definite amount of gas, two million cubic feet per day the first year, and three million the

last two years, with reservations protecting both vendor and vendee. It is not a contract to furnish the requirements of the buyer, as Judge LEWIS has demonstrated; it could not be, when all parties agree that the buyer's known requirements were far in excess of the amount specified in the contract. The agreement left open the question of furnishing and receiving amounts in addition to the two or three million feet, for their mutual consent, as stated in the concurring opinion; the excess being left to a future agreement, there is no present contract as to such excess.

There are reservations to the obligation of the vendor to furnish two or three million feet, the principal one of which is that it was only obligated to furnish gas to the limit of its capacity. There is a reservation to the obligation of the vendee to buy two or three million cubic feet, to wit, if its requirements did not equal or exceed that amount, it should only be required to take the amount of its requirements. Does this clause mean, as it says, that the vendee need buy no gas if none is required? Appellant, conceding that some meaning must be given to the limitation, argues that this reservation is only applicable to temporary fluctuations in the demands of an operating plant. It should be enough to say that the contract contains no such qualification; moreover, the suggested interpolation is unreasonable, for when we consider the fact that the smelter's requirements from October to June averaged six and one-half million cubic feet per day, appellant's suggestion would make the clause practically meaningless.

I think the appellee was entitled to a directed verdict. The parties agreed upon a partial supply of gas needed for a particular smelter described in the contract. If that smelter burned any gas, appellee must purchase it of appellant, up to the specified amount. That is a fair and valid contract. Vendee could not escape its obligation by selling the smelter; as long as the smelter required gas, the obligation remained. But does the obligation remain if the smelter is destroyed by fire, or is razed by a tornado, or is dismantled because of the collapse of business? In such events, no gas is required for the smelter, and there was no agreement to buy gas not required. It matters not whether the dismantling occurred in a year, or a month, or a day. That is the contract the parties made.

Judge COTTERAL penetrates to the core of the case when he says: "The defendant owning an established business had the im-

plied obligation to continue it in the usual manner, and accept during the time fixed the gas required to so conduct it."

This is in accord with the contention of appellant, its brief stating: "It is our contention that this contract means that the defendant is to continue its operations in the usual business way."

Vendee did not expressly covenant to operate the smelter for three years, regardless of fires or tornadoes or economic conditions that required a dismantling of the plant. I am unable to imply such a far-reaching covenant into the contract. The cases cited in support of the proposition that such a covenant should be read into this contract do not seem to me to be in point. Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co. (C. C. A. 8) 114 F. 77, 57 L. R. A. 696, Lima Locomotive & M. Co. v. National Steel C. Co. (C. C. A. 6) 155 F. 77, 11 L. R. A. (N. S.) 713, Texas Co. v. Pensacola Maritime Corp. (C. C. A. 5) 279 F. 19, 24 A. L. R. 1336, and Griffin v. Oklahoma Natural Gas Corp. (C. C. A. 10) 37 F.(2d) 545, hold that an agreement to buy or sell the requirements of an established business is sufficient consideration to support a contract. Hickey v. O'Brien, 123 Mich. 611, 82 N. W. 241, 49 L. R. A. 594, 81 Am. St. Rep. 227, Loudenback Fertilizer Co. v. Tennessee Phosphate Co. (C. C. A. 6) 121 F. 298, 61 L. R. A. 402, Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218, Kamm v. Pritchard (C. C. A. 5) 296 F. 871, and Great Lakes & St. L. T. Co. v. Scranton Coal Co. (C. C. A. 7) 239 F. 603, hold that an agreement to purchase the requirements of a business cannot be evaded by a sale or in other devious ways. With these decisions I am in entire accord. They do not reach the question of a business which has no requirements. In Du Pont de Nemours Powder Co. v. Schlottman (C. C. A. 2) 218 F. 353, the purchase price of a plant was to be determined by the success of a year's operation of the plant; an agreement to continue operations was necessarily implied. In Diamond Alkali Co. v. P. C. Tomson & Co. (C. C. A. 3) 35 F.(2d) 117, and in Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283, 62 N. E. 367, an implied obligation was found to exist, under the circumstances of those cases; but in each case, oral evidence was received in an effort to ascertain the intent of the parties. The oral evidence in the case at bar is all to the effect that no such obligation was intended by either party.

It is then urged that the parties contemplated continued operations of the smelter for three years; that vendor constructed the gas line because of that contemplation. The vendor did not agree to construct the line; section 7 released it from liability if the line was not constructed; it had other customers, and this smelter was shut down during 1920 and 1921. It is therefore doubtful if it can be said that the vendor contracted with any other contemplation than that a large consumer of gas was willing to contract for its needs up to a certain amount. Be that as it may, the expectation of vendor that operations will continue does not take the place of a covenant by vendee that they will continue. Eddy v. Clement, 38 Vt. 486; Whitman v. Anglum, 92 Conn. 392, 103 A. 114; Northern Irrigation Co. v. Watkins (Tex. Civ. App.) 183 S. W. 431; Turner v. Goldsmith, 1 Q. B. 544. If we are to interpolate a covenant or a stipulation into this contract because of the expectations of the parties, what will it be? A covenant continuously to operate, as Judge COTTERAL suggests, or a stipulation that the obligation of vendee terminates in event of a dismantling of the smelter? The question of what implied provision will conform to the contemplation of the parties must be answered either with or without the help of testimony as to what they contemplated. If testimony may be resorted to, the evidence is undisputed that a covenant for continued operations was not contemplated; on the contrary, the clause in section 2 was to protect against such implication. If testimony is not resorted to, then the court must determine from the written contract, what agreement the parties probably would have made on the subject. I think it highly improbable that vendee would ever have agreed to the covenant now implied; I think it more reasonable to assume that the vendor was willing to take the chance of continued operations, than to assume that vendee would agree to operate its smelter at a loss, or to pay for gas it did not use.

Where parties have entered into written contracts, the courts are reluctant to enlarge them by implication, the presumption being that they have expressed all the conditions by which they intended to be bound. Loyalton Electric Light Co. v. California Pine Box & Lumber Co., 22 Cal. App. 75, 133 P. 323; Barnes v. American Brake-Beam Company, 238 Ill. 582, 87 N. E. 291; Northern Irrigation Co. v. Dodd (Tex. Civ. App.) 162 S. W. 946; Prest v. Farmington, 117 Me. 348, 104 A. 521, 2 A. L. R. 1390; McPherson v. Gullett Gin Company, 134 Miss. 771, 100 So. 16; Brown v. Fales, 139 Mass. 21, 29 N. E. 211.

Only such provisions will be implied as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made. Sacramento Nav. Co. v. Salz, 273 U. S. 326, 329, 47 S. Ct. 368, 71 L. Ed. 663; Williston on Contracts, § 1293; Brodie v. Cardiff Corporation (1919) A. C. 337, 358. Stipulations not actually made, and to which the parties might not have assented, cannot be imported into a contract, however equitable they may be. Nims v. Vaughn, 40 Mich. 356; Raner v. Goldberg, 244 N. Y. 438, 155 N. E. 733. A covenant will not be implied if in conflict with express provisions of the contract. Cliffe Company v. Du Pont Engineering Co. (D. C. Del.) 298 F. 649; Berry v. Humphreys, 76 W. Va. 668, 86 S. E. 568; Foley v. Euless (Cal. Sup.) 6 P.(2d) 956. Covenants or conditions should never be implied unless it is entirely clear, from the contract and the circumstances, that the parties intended so to bind themselves.

To imply a covenant on the part of vendee to continue to operate this smelter for three years, is in conflict with the principles above stated. The parties in this case reduced their engagement to writing. It is a comprehensive and complete agreement, and provides for many eventualities. To import therein a covenant by the vendee that the smelter would be continuously operated for three years, or that it would pay for gas it had no need for, is to contract where the parties did not. It is not essential to the carrying out of a contract by which the vendor is given a preferential right to furnish gas if any is required. The evidence discloses that vendee would not sign except upon assurance that the contract contained a clause exactly to the contrary of the one which the court implies. Nor is it unreasonable to assume that the vendor, for the purpose of securing a large customer for its enterprise, was willing to assume what appeared to be the slight risk of a shut-down of the smelter. The covenant here implied is in conflict with the express limitation in section 2.

There appears to be a dearth of authority directly in point. There are numerous cases where a buyer undertook to escape his obliga-tion by selling a business. But in those cases, the business continued to operate, and the agreement to buy its requirements of course remained undischarged. Here the business stopped, and there were no requirements. There are two cases, decided by courts of high authority, that consider a situation quite similar. In Pellet v. Manufacturers' & Merchants' Ins. Co. (C. C. A. 7) 104 F. 502, and in English & Scottish Marine Ins. Co., 5 Ch. App. 737, it appeared that the insurance company defendant had in each case contracted with an agent for representation in a given territory for a period of time. During the period in question, the insurance companies ceased or curtailed operations in the territory. Both courts held that while the agents were entitled to represent the companies as to any business done in the territory, no obligation could be implied that required the companies to continue in business in the usual way for the period involved. Mr. Williston, in discussing the consideration of requirement contracts, touches upon the precise point here involved. He says: "Though it may be true that a seller by ceasing to manufacture may relieve himself from any performance and still keep a promise to sell all the goods he manufactures, and similarly a buyer by going out of business may avoid performance while still observing the terms of an agreement to buy all that he requires, these results can be obtained only by doing something which is in itself a legal detriment, namely, the cessation of business." Williston on Contracts, § 104.

The appellant herein agreed that appellee's obligation to purchase two or three million cubic feet per day should be limited by the provision that if the requirements of the smelter did not equal that amount, appellee need only take its total requirements. The smelter was dismantled and neither required nor used any gas during that period. Appellant cannot recover, therefore, unless this limitation of obligation is ignored, or unless a covenant by appellee to operate the smelter for three years is implied. I am unwilling to do either. I think the contract should be enforced as written, and that the judgment of the trial court should be affirmed.